United States Court of Appeals
Fifth Circuit

**F I L E D**

April 6, 2005

Charles R. Fulbruge III
Clerk

I n the

# United States Court of Appeals
## for the Fifth Circuit

m 03–41738

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

VERSUS

W. LASSITER HOLMES, III,

Defendant-Appellant.

Appeal from the United States District Court
for the Southern District of Texas

Before HIGGINBOTHAM, SMITH, and
BENAVIDES, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

W. Lassiter Holmes, III, an attorney practicing in McAllen, Texas, was convicted of mail fraud and conspiracy to commit mail fraud, stemming from a scheme he executed with Pauline Gonzalez, who at the time was the District Clerk of Hidalgo County, Texas, to back-date and file a fraudulent original petition in a medical malpractice suit Holmes was handling, for purposes of avoiding a statute of limitations bar. Holmes challenges his conviction and sentence on eight grounds. Finding no reversible error with respect to his conviction and no plain error with respect to his sentence, we affirm.

I.

Holmes was retained in 1994 to represent Hector and Felipa Gonzalez in a medical malpractice suit after Hector Gonzalez suffered the loss of a kidney from the alleged negligence of Dr. Miguel Aleman. Over the course of the next two years, Holmes worked sporadically on the case, seeking relevant medical

records and attempting to procure an expert report. In May 1996, Holmes realized that the statute of limitations on the tort claims would soon expire.[1]

On May 14, 1996, Holmes filed a pleading styled "Plaintiff's Original Petition" with the Hidalgo County District Clerk's Office. A letter from an expert witness, bearing the same date, was attached. Holmes paid the required filing fee ($183.00) with a check (#1361) drawn from his law firm and likewise dated May 14, 1996. The clerk's office opened a new case file, assigned a new cause number, and date-stamped the petition May 14, 1996. That same day, Holmes personally delivered a copy of the petition to Aleman's attorney, Ron Hole, and faxed a copy to Ross.

Although the parties took discovery, the suit remained largely dormant for three years, but on May 3, 1999, Hole received a letter from Bobby Garcia, an attorney Holmes had brought in to work on the Gonzalez suit, seeking to settle the case for $3.5 million. Several days later, on May 8, 1999, the parties attended a court-ordered mediation.

During the course of the mediation, the mediatorSSconducting shuttle-diplomacy between the partiesSSapproached Hole and his partner Micaela Alvarez, both of whom were representing Aleman, and inquired whether they planned to make a settlement offer. They said no. The mediator admonished them to reconsider, telling them they were "barking up the wrong tree" if they thought they had a limitations defense. (Hole had asserted a limitations defense in his answer to the May 14, 1996, petition, but never urged it during discovery.) Specifically, the mediator told the defense what Holmes had relayed to her moments before: He had mailed an original petition *before* filing the May 14, 1996, petition, and he had an envelope to prove it.

Because this was the first time the issue of an earlier, mailed petition had been raised, Hole and Alvarez went to the clerk's office on May 10, 1999. They examined the case file for the suit filed by Hector Gonzalez against Aleman and found no indication that a petition had been filed in advance of the petition that was date-stamped May 14, 1996.

On May 11, 1999, Hole moved for summary judgment raising, *inter alia*, the defense that limitations had run on May 11, 1996, but suit was not initiated until May 14, 1996. The next day, May 12, 1999, Holmes sent the following letter by fax to Pauline Gonzalez,[2] the then-elected District Clerk for Hidalgo County:

Dear Ms. Gonzalez:

Upon May 7,1996 I mailed a petition style [sic] Hector and Felipa Gonzalez vs. Dr. Miguel Aleman. It has come to my attention that the petition was never made part of the record.

Could you please conduct an investi-

---

[1] Holmes relayed this point to Richard Ross, the insurance adjustor assigned to handle Aleman's case, in a phone conversation on May 14, 1996, in which Holmes said he would be filing Hector Gonzalez's suit "today," because limitations would expire the next day.

[2] Holmes copied Hole on this letter and sent him a version by mail. The letter sent to Hole was not, however, a photocopy of the letter faxed to Gonzalez but was a re-typed version that, save for a typographical error, is identical.

gation into this matter to determine if this petition was ever received by your office.

Thank you for your assistance.

Sincerely,
[Signed by stamp]
W. Lassiter Holmes, III

Pauline Gonzalez faxed the following answer on May 13, 1999:

In response to your inquiry, the plaintiff's original petition in cause number C-2564-96-B was received. The search was conducted and petition was found in our office bearing the stamp file date of May 7, 1996.

If you have any questions or inquiries, please do not hesitate to contact me.

Sincerely,
[No signature]
Pauline G. Gonzalez
District Clerk
Hidalgo County

Indeed, when Alvarez returned to the clerk's office on May 13 to reexamine the file, she discovered a document styled "Plaintiff's Original Petition," this one bearing a file stamp of May 7, 1996.[3] This petition contained Holmes's signature in blue ink and a notation of check number 1361 under the signature

block.[4] In addition, Alvarez discovered what remained of a pre-printed envelope, postmarked May 7, 1996, with the return address of Holmes's law firm. The envelope was severely torn such that the content of the addressee portion was not legible save the letter "S," preceded by a portion of a letter that appears to be an "E," and a small portion of a third letter.[5]

In light of the sudden emergence of this hitherto nonexistent document, Hole sought and received permission from the state district court to depose Holmes and Pauline Gonzalez.[6] In his deposition, Holmes testified that he mailed the newly-discovered original petition on the evening of May 6 and that he had addressed the now-torn envelope to Pauline Gonzalez and had misspelled her name to end in an "ES."

Although the record is opaque on the exact circumstances, Holmes subsequently entered

---

[3] Unlike the petition filed on May 14, however, this petition was not time-stamped and did not have a signature stamp naming the particular deputy clerk who had received the pleading, both of which the record reveals were customary practices in the clerk's office.

[4] The check number on this petition is the same as the check dated May 14 with which Holmes paid the filing fee for the May 14 petition.

[5] The true addressee of this envelope was a significant issue at trial, because the government alleged, and attempted to prove through expert testimony from a Texas Department of Public Safety document examiner, that Holmes provided this envelope as part of his fraudulent scheme: The government maintained that the envelope was likely a self-addressed stamped envelope Holmes had in an old case file with his law firm's name as the addressee, and he tore the envelope such that only the letters "ES" remained.

[6] Hole subsequently received permission from the state district court to remove the petition dated May 7 for purposes of conducting nondestructive forensic testing.

3

into a settlement agreement by which he would dismiss all claims against Aleman and pay $15,000 to Aleman's insurance carrier. Holmes also executed an agreement with Hector and Felipa Gonzalez whereby they agreed to release all malpractice claims against Holmes in exchange for $10,000.

Holmes did not, however, obtain peace with these settlements: Hole and Alvarez filed a formal grievance against him with the State Bar of Texas. At a disciplinary hearing held in October 1999, Hole presented forensic evidence that the bond paper on which the May 7 petition was printed contained a watermark and date code. According to the manufacturer,[7] Hole maintained, the date code corresponded to the year 1997, and thus the bond paper could not have been manufactured before 1997. The petition could not, therefore, have been printed and mailed, as Holmes suggested, in May 1996. Holmes received a sanction of two years' probation from the state bar.

## II.

Texas authorities subsequently initiated an investigation of the Hidalgo County Clerk's Office. In an interview with Texas Ranger Israel Pacheco on March 26, 2001,[8] Holmes gave a revised version of the events: He had made several attempts to obtain a copy of the original petition he mailed on May 6, before he filed the petition on May 14, but the clerk's office was unable to locate the original petition, so he brought a *copy* of the earlier, original petition to the clerk's office as a "go-by" to show employees the document he was looking for.

Federal investigators initiated an independent investigation. He and Pauline Gonzalez were indicted for conspiracy to commit mail fraud in violation of 18 U.S.C. § 371 (count one) and mail fraud in violation of 18 U.S.C. §§ 1341 and 1346 (count two).[9]

Holmes testified in his own defense, trying to convince the jury that the copy he brought to the clerk's office as a "go-by" became the petition file-stamped May 7, when someone in the clerk's office erroneously file-stamped it.[10] As for the May 14 petition, Holmes's story was that he mailed the original petition on May 6, but it did not contain an expert report, so after securing an expert report he went to the clerk's office with another petition attaching the report; and because the deputy clerk was unable to tell him what cause number had been assigned to his earlier petition, he filed the May 14 petition "as if it were the new filing expecting that, when the May 6 petition was located, the District Clerk's Office would clean up the paperwork."

The jury was not persuaded, and Holmes was convicted on both counts. He now ap-

---

[7] The government presented the testimony of Edward Kennedy, a longtime employee of Boston-based Southworth Paper Company, the manufacturer of the bond paper, who corroborated these facts. Holmes made no effort to dispute this evidence at trial.

[8] Holmes was represented at this meeting by counsel, and both he and counsel took copious notes. *See infra* part VI.

[9] Gonzalez was not tried with Holmes: After the indictment was returned, she became physically incapacitated, suffering from life-threatening health problems. She died while charges were pending.

[10] According to this theory, the earlier, original petition Holmes claims to have mailed is still missing, although the envelope in which he claims to have mailed it has surfaced.

4

peals his conviction and sentence on various grounds.

## III.
### A.

Holmes contends the district court admitted the videotaped and transcribed deposition testimony of Pauline Gonzalez in contravention of his Sixth Amendment right of confrontation. The government proffered Gonzalez's deposition testimony as a co-conspirator's statement under Federal Rule of Evidence 801(d)(2)(E), according to which a statement is admissible nonhearsay if it is made (1) by a co-conspirator (2) during the course of the conspiracy and (3) in furtherance of the conspiracy. The government asserts that Gonzalez's deposition, which was taken by Hole on May 19, 1999, only a few days after the petition file-stamped May 7, 1996, was discovered, consisted of statements by a co-conspirator made in furtherance of the conspiracy with Holmes, insofar as her testimony was an effort to conceal the objectives of a conspiracy then occurring.[11]

During Hole's direct testimony, the government played Gonzalez's videotaped deposition and offered a transcribed copy of the deposition into the record. Before playing the tape, the court inquired whether there was any objection, to which defense counsel responded, "None whatsoever, Judge." The court likewise inquired whether there was any objection before admitting the transcribed copy of the deposition, to which defense counsel responded in kind, "No objection, Judge."

Notwithstanding the almost-inviting approach to this evidence taken at trial, Holmes submits on appeal that the admission of this evidence violated his rights under the Confrontation Clause.[12] Given Holmes's failure to object, our review is for plain error. *See United States v. Cartwright*, 6 F.3d 294, 300 (5th Cir. 1993); FED. R. CRIM. P. 52(b).

### B.

Holmes relies on *Crawford v. Washington*, 541 U.S. 36, 124 S. Ct. 1354 (2004), in which the Court fundamentally altered the scope and effect of the Confrontation Clause by replacing the standard-driven balancing test, which had delimited the right to confrontation, with a categorical rule barring the admission of out-of-court testimonial statements against the accused absent opportunity for cross-examination. *See Crawford*, 124 S. Ct. at 1374.

Before *Crawford*, the right of confrontation was controlled by *Ohio v. Roberts*, 448 U.S. 56, 66 (1980), which held that the Sixth Amendment does not bar admission of an unavailable witness's statement against a criminal defendant so long as the statement bears "adequate 'indicia of reliability.'" To meet that test, *Roberts* required that the out-of-court statement either fall within a "firmly rooted hearsay exception" or bear "particularized guarantees of trustworthiness." *Id.* Applying this approach, the Court held, in *Bourjaily v. United States*, 483 U.S. 171, 183-84 (1987), that the co-conspirator exception to the hearsay rule was sufficiently steeped in our jurisprudence that "the Confrontation Clause

---

[11] *See United States v. Phillips*, 219 F.3d 404, 419 (5th Cir. 2000) ("Efforts to conceal an ongoing conspiracy obviously can further the conspiracy by assuring that the conspirators will not be revealed and the conspiracy brought to an end.").

[12] "In all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI.

5

does not require a court to embark on an independent inquiry into the reliability of statements that satisfy the requirements of Rule 801(d)(2)(E)."

*Crawford* abrogated *Roberts* with respect to prior testimonial statements: Such statements may not be admitted against a defendant unless he has an opportunity to cross-examine the declarant, irrespective of whether the statement falls within a firmly rooted hearsay exception or bears particularized guarantees of trustworthiness.[13] With respect to non-testimonial statements, however, *Crawford* leaves in place the *Roberts* approach to determining admissibility.[14]

1.

Because the categorical rule adopted in *Crawford* is triggered only with respect to "testimonial" evidence, whether a challenged statement falls within the class of evidence deemed "testimonial" will generally be outcome-determinative. But *Crawford* declined to "spell out a comprehensive definition of 'testimonial.'" *Crawford*, 124 S. Ct. at 1374. Instead, the Court held that "[w]hatever else the term covers, it applies at a minimum to prior testimony at a preliminary hearing, before a grand jury, or at a former trial; and to police interrogations." *Id.* Beyond these specific examples, however, the boundaries of testimonial evidence remain unsettled. The Court quoted three potential formulations of the "core class" of testimonial statements but declined to adopt or reject any of them.[15]

In the case at hand, we are presented with a challenge to the admission of a co-conspirator's statement made during the course and in furtherance of the conspiracy in civil deposition testimony. Statements made by a co-conspirator during the course and in furtherance

---

[13] *See Crawford*, 124 S. Ct. at 1374 ("Where testimonial statements are at issue, the only indicium of reliability sufficient to satisfy constitutional demands is the one the Constitution actually prescribes: confrontation."); *id.* ("Where testimonial evidence is at issue . . . the Sixth Amendment demands what the common law required: unavailability and a prior opportunity for cross-examination.").

[14] *Crawford* does, however, explicitly leave open the possibility of "an approach that exempted [nontestimonial] statements from Confrontation Clause scrutiny altogether." *Id.* Nevertheless, to the extent the Court declined to overrule *White v. Illinois*, 502 U.S. 346 (1992), in which a majority of the Court rejected a view of the Confrontation Clause that would place no constitutional limits on the admissibility of nontestimonial statements, instead leaving their admissibility to controlling hearsay law, *see Crawford*, 124 S. Ct. at 1370 ("Although our analysis in this case casts doubt on that holding, we need not definitively resolve whether [*White*] survives our decision today . . . .'), *Roberts* remains controlling for purposes of nontestimonial statements.

[15] These include: (1) "*ex parte* in-court testimony or its functional equivalentSSthat is, material such as affidavits, custodial examinations, prior testimony that the defendant was unable to cross-examine, or similar pretrial statements that declarants would reasonably expect to be used prosecutorially," *Crawford*, 124 S. Ct. at 1364 (citation omitted); (2) "extrajudicial statements . . . contained in formalized testimonial materials, such as affidavits, depositions, prior testimony, or confessions," *id.* (quoting *White*, 502 U.S. at 365) (Thomas, J., concurring in part and concurring in the judgment)); and (3) "statements that were made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial," *id.* (citation omitted).

6

of a conspiracy are by their nature generally nontestimonial and thus are routinely admitted against an accused despite the absence of an opportunity for cross-examination.[16] The challenged evidence here, however, is not the run-of-the-mill co-conspirator's statement made unwittingly to a confidential government informant,[17] or made casually to a partner-in-crime; rather, we have a co-conspirator's statement that is derived from a formalized testimonial sourceSSrecorded and sworn civil deposition testimony.

## 2.

Whether this evidence is "testimonial" as *Crawford* used that term is uncertain. This case does not, however, require resolution of whether Gonzalez's civil deposition qualifies as testimonial evidence triggering the right of confrontation. Even assuming *arguendo* that her deposition is testimonial under *Crawford*, there was no constitutional error, because the government did not offer her testimony to prove the truth of the matter asserted.[18]

In her deposition, Pauline Gonzalez lamented the organizational problems in the clerk's office, testifying that her office was forced to deal with sloppy lawyers who were invariably forgetting and confusing pleadings, and was staffed by rotating and volunteer clerks prone to mistakes. Pauline Gonzalez thus explained that someone in the office could have mistakenly back-dated the petition after looking up the case information on the computer and using the postmark date stamped on the torn envelope.

Far from offering this testimony to prove its *truthfulness*, the government sought to establish its *falsity* through independent evidence. Indeed, the entire thrust of the government's case was that the back-dating was not the result of a clerical error, but instead was the objective of an illicit conspiracy between Holmes and Pauline Gonzalez. Gonzalez's testimony was thus offered both to show the

---

[16] *See, e.g.*, *id.* at 1367 (challenging the concurrence's suggestion that hearsay exceptions historically have permitted admission of testimonial statements against the accused in a criminal case, reasoning that "[m]ost of the hearsay exceptions covered statements that by their nature were not testimonialSSfor example, business records or statements in furtherance of a conspiracy."); *United States v. Reyes*, 362 F.3d 536, 540 n.4 (8th Cir. 2004) (rejecting *Crawford* argument on ground that "co-conspirator statements are non-testimonial"); C. MUELLER & L. KIRKPATRICK, FEDERAL EVIDENCE § 398.1 (2004) ("[C]oconspirator statements . . . are non-testimonial in character and admitting them does not infringe defense confrontation rights."); *United States v. Delgado*, No. 03-41379, 2005 U.S. App. LEXIS 2686, at *18 (5th Cir. Feb. 16, 2005) ("*Crawford* is not applicable to [hearsay statements made during the course and in furtherance of a conspiracy] because they are not testimonial hearsay statements.").

[17] *See, e.g.*, *Bourjaily*, 483 U.S. at 181-84 (holding admissible as against a Confrontation Clause challenge co-conspirator's unwitting statements to an FBI informant despite absence of opportunity for cross-examination and unavailability of declarant); *United States v. Saget*, 377 F.3d 223, 229-30 (2d Cir. 2004) (holding that co-conspirator's statement made unwittingly to police was nontestimonial and thus admissible against defendant despite absence of opportunity for cross-examination).

[18] *See Crawford*, 124 S. Ct. at 1369 n.9 ("The [Confrontation] Clause . . . does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted.") (citing *Tennessee v. Street*, 471 U.S. 409, 414 (1985)).

existence of a scheme and to prove one of the overt acts charged in the indictment.[19] Even assuming that her civil deposition testimony is testimonial within the meaning of *Crawford*, then, this nonhearsay use of her testimony poses no Confrontation Clause concerns. *See Crawford*, 124 S. Ct. at 1369 n.9; *Street*, 471 U.S. at 414.[20]

### 3.

The irony is that Holmes was keenly aware of the fact that Pauline Gonzalez was not a "witness[] against him" inasmuch as her deposition testimony was not inculpatory. In fact, it was Holmes, not the government, that repeatedly relied on her deposition testimony at trial for its truthfulness. The record is replete with instances in which Holmes pointed to Gonzalez's deposition testimony as *exculpatory* and corroborating his primary defense theorySS*i.e.*, that the pleading he provided as a "go-by" must have been back-dated in error by someone in the clerk's office.

During opening argument, for example, the defense pointed to the deposition as exculpatory:

Pauline Gonzalez, by way of her testimony, will tell you what she thinks happened on that videotape. Someone took that blank petition, looked it up in the computer, pulled that case out of the computer, because [the government] already told you it was filed on [May] 14.

The defense relied on the exculpatory nature of her deposition testimony again while cross-examining Ron Hole:

Q: Ms. Gonzalez offered an explanation for how this could have happened, didn't she?

A: Not in my mind; it was not a plausible explanation.

Q: She attempted or said that it could have been file marked by mistake, didn't she say that in the deposition. . . . And she indicated that some clerk or some volunteer working in the office could have done it accidentally and not deliberately, without any malice, on the video.

The defense returned to the exculpatory force of her testimony again during closing argument:

Now, Ms. Gonzalez says on her video, sworn deposition: Someone could very easily have said, just put the cause number on it or file it. Put it with the file. . . . Well, that's not a crime, and no one should go to the penitentiary and be convicted of two federal felonies for that.

---

[19] The indictment returned by the grand jury specifically charged that "[o]n or about May 19, 1999, Defendant Pauline Gonzalez testified falsely in a deposition regarding a civil petition bearing a file-stamped date of May 7, 1996."

[20] The manner in which Holmes has presented this claim to the court bears mentioning: His claim amounts to a wholesale challenge to Gonzalez's testimony. That is, of the less than two pages his brief devotes to this claimed constitutional error, Holmes does not identify a single specific statement made by Gonzalez that was offered against him for the truth of the matter asserted. At oral argument, the government stressed the nonhearsay use of this evidence, and we asked defense counsel why such use would pose Confrontation Clause concerns, to which we were told, without elaboration or example, "there were truthful matters asserted."

That the government did not offer Gonzalez's civil deposition testimony for the purpose of proving the truth of the matters to which Holmes points cannot seriously be contested. After all, the entire *raison d'etre* for the indictment and the felony charges was the government's belief that the back-dated petition was the result of a criminal conspiracy and not some clerical error. Because the government did not offer her testimony for its truth, there is no Sixth Amendment violation.[21]

## IV.

Holmes contends that the evidence is insufficient to sustain his convictions for conspiracy to commit mail fraud and the substantive mail fraud offense. We address each count in turn.

### A.

"It is by now well-settled that a defendant

---

[21] Of course, even if we had found an error, a separate question would follow: whether, having forfeited the error by failing to object, we would exercise our discretion under rule 52(b) to correct it. (In *Crawford*, the Court noted the applicability of the harmless error doctrine, *see Crawford*, 124 S. Ct. at 1359 n.1; *id.* at 1378 (Rehnquist, C.J., concurring in the judgment); but we do not read those references as altering the applicability of the plain error rubric where there was no trial objection, and thus Holmes would have the burden of demonstrating that the error affected substantial rights.)

Although our disposition renders this inquiry unnecessary, we note that it would be strange, indeed, were we to hold that the *admission* of evidence to which the accused repeatedly relied upon as *exculpatory* and favoring an acquittal was such an egregious error that justice and the public integrity of the judicial process require the remedy he seeks: reversal. More likely, the opposite is true.

seeking reversal on the basis of insufficient evidence swims upstream." *United States v. Mulderig*, 120 F.3d 534, 546 (5th Cir. 1997). In reviewing a challenge to the sufficiency of the evidence, we view all the evidence and the reasonable inferences drawn therefrom in the light most favorable to the verdict, and ask whether a rational trier of fact could have found that the evidence established the elements of the offense beyond a reasonable doubt. *See, e.g.*, *United States v. Smith*, 296 F.3d 344, 346 (5th Cir. 2002). "In so doing, we apply a 'rule of reason,' knowing that the jury may properly rely on their 'common sense' and 'evaluate the facts in light of their knowledge and the natural tendencies and inclinations of human beings.'" *Mulderig*, 120 F.3d at 547 (quoting *United States v. Ayala*, 887 F.2d 62, 67 (5th Cir. 1989)).

Because the jury is "free to choose among reasonable constructions of the evidence," *United States v. Richards*, 204 F.3d 177, 206 (5th Cir. 2000), and retains the sole authority to "weigh conflicting evidence and evaluate the credibility of the witnesses," *United States v. Milsaps*, 157 F.3d 989, 994 (5th Cir. 1998), "it is not necessary that the evidence exclude every reasonable hypothesis of innocence or be wholly inconsistent with every conclusion except that of guilt." *United States v. Williams*, 264 F.3d 561, 576 (5th Cir. 2001). If, however, the evidence viewed in the light most favorable to the verdict points *equally* to a theory of innocence and guilt, we will reverse a conviction based on circumstantial evidence. *Mulderig*, 120 F.3d at 546.

### B.

Holmes challenges the sufficiency of the evidence to support his conviction of conspiracy, characterizing the government's case as establishing *only* that he prepared a pleading

and gave it to the clerk's office, which, in turn, file-stamped it May 7, 1996. Although he admits that it is "not unreasonable to conclude from the record" that Pauline Gonzalez caused the back-dating to occur, he contends that the evidence is insufficient in two allegedly critical respects: First, there is no evidence demonstrating his knowledge of the back-dating at the time; and second, there is no evidence demonstrating any motive on the part of Gonzalez to back-date the pleading. In the absence of such evidence, Holmes claims he cannot properly be found guilty of conspiracy without "wild speculation."

### 1.

To prove a conspiracy in violation of 18 U.S.C. § 371, the government must establish three elements beyond a reasonable doubt: (1) an agreement between two or more persons to pursue an unlawful objective; (2) the defendant's knowledge of the unlawful objective and voluntary agreement to join the conspiracy; and (3) an overt act by one or more members of the conspiracy in furtherance of the objective of the conspiracy. *E.g.*, *United States v. Peterson*, 244 F.3d 385, 389 (5th Cir. 2001). "The Government need not rely on direct evidence of a conspiracy; each element may be proven by circumstantial evidence." *Mulderig*, 120 F.3d at 547.

### 2.

The evidence is sufficient to support conspiracy. Although his trial story differedSSas it had to, given the bond paper revelationSSfrom his earlier deposition testimony, Holmes admitted that the May 7, 1996, petition could not have been mailed on that date and that he printed and signed the petition that was ultimately back-dated May 7, 1996, by the clerk's office and placed into the case file.

Coupled with this admission, the jury could reasonably have concluded that the envelope in which Holmes claims to have mailed the original petition on May 6, 1996, was actually a self-addressed envelope in which something was returned to Holmes's law firm.[22] If this envelope, which as the postmark reveals had at one point been properly mailed, was in fact addressed to Holmes's law firm, the jury reasonably could have concluded that it was at some point prior to being placed in the clerk's case file in Holmes's possession.

At a minimum, then, the evidence reveals that Holmes gave someone in the clerk's office both the petition that was ultimately back-dated and the envelope in which he claims to have mailed the original petition. The question, then, is whether there was an agreement or common purpose to back-date the pleading and represent it to be the original. On that score, as the district court observed in its thorough post-trial memorandum, the testimony of three clerk's employees is sufficient to give rise to the inference that Holmes was knowingly working in concert with Pauline Gonzalez.

First, Alexandra Gomez, a criminal appeals clerk, testified that Holmes approached her "and he asked me . . . if I could step outside because he needed to speak with me." She

---

[22]A forensic document expert from the Texas Department of Public Safety testified that the partially visible letter preceding the letters "ES" could not have been an "L." The expert testified that the letter was more likely an "M," which, of course, would be consistent with "Holmes." The jury reasonably could have credited this testimony rather than accepting Holmes's testimony that the "ES" resulted from his misspelling of Gonzalez's last name.

testified that Holmes asked "if it was possible for me to back-file something for him that needed to be put into the file, or should have been put in the file. And I told him I could not." After refusing Holmes's request, Gomez told Holmes she "could not be the one to do that, that he would need to speak with Ms. Gonzalez to see what she could do." Gomez testified further that a week after she refused Holmes's request, Gonzalez "called me on the telephone and asked me to stamp file a pleading that was on her desk with the date it had written on it," but that she refused because she "knew it was against our rules to do that, the District Clerk's Office rules."

Second, Veronica Muniz testified that, at some point during the critical time period (May 10-13, 1999), she observed Holmes speaking with Pauline Gonzalez in Gonzalez's "glassed-in" office. And, although she was the employee in the clerk's office who had examined the file with Hole and Alvarez and did not find any indication of an earlier petition, Muniz testified that shortly after observing Holmes and Gonzalez speaking privately, she "saw a letter printing out that said they [the clerk's office] had found the document." She then identified the May 13, 1999, letter sent by fax from Gonzalez to Holmes as the letter she observed in the printer, and relayed that, upon seeing the letter, "I was surprised because I had, you know, I had been looking through the file, and I couldn't find anything. So I was just surprised that . . . it had been found . . . ."[23]

Third, Viola Wise testified that she prepared the May 13, 1999, letter from Pauline Gonzalez to Holmes at the direction of Gonzalez. Specifically, Wise testified to a conversation she had with Gonzalez during which Gonzalez "said that she had found a . . . missing document" and instructed Wise to "go ahead and make a letter stating that [Gonzalez] had found the paperwork."

Based on this testimony, the jury could reasonably have concluded that Holmes was seeking assistance to back-date a petition; and that after Holmes met privately with Pauline Gonzalez, she asked Gomez (exactly what Holmes had previously asked her) to back-date the petition, and that Gonzalez then directed another employee to prepare a letter stating that the petition had been "found." This testimony, when taken together with Holmes's admission that the petition ultimately back-dated was printed and signed as an original by him and provided to the clerk's office, and the expert testimony concerning the envelope, is more than sufficient to establish an adequate picture of Holmes's role in the conspiracy. Thus, despite Holmes's continued reliance on his version of the events in questionSSthat someone in the clerk's office must have back-dated the pleading in errorSSthe jury was free to reject his explanation and accept the government's.

To the extent Holmes relies on the government's failure to establish Pauline Gonzalez's motive, he is attempting to avail himself of the absence of evidence the government was not required to offer. To be sure, the government did not establish Gonzalez's motive for conspiring with Holmes to back-date the petition; indeed, the government admitted as much during closing argument:

---

[23] Muniz also testified that it was "significant" that the back-dated petition was not signed by a clerk, observing that "[b]ecause [if] it's [an] original petition . . . it should have the specific time that it was filed and it also should have a signature on it."

11

The only thing you-all aren't charged to figure out is what the motive of everybody is, and I submit to you, I can't exactly tell you what Ms. Gonzalez's motive was. I'll tell you she did violate her oath of office. I'll tell you she did something illegal. Whether [Holmes] promised to give her some money on the end, I don't know. I think it's reasonable to suspect, but I think it's equally reasonable that she just is corrupt and just decided to allow a lawyer to do something like that, and she was willing to use her office to help him.

Nevertheless, because the government is not required to prove Gonzalez's subjective intent for conspiring with Holmes, the absence of such motive evidence does not render insufficient the evidence supporting Holmes's conviction of conspiracy.

## C.

With respect to the substantive mail fraud offense, Holmes contends that the evidence is insufficient to support his conviction because the alleged misrepresentations were immaterial. Specifically, he reasons that regardless of whether the May 7 or May 14 date is used for purposes of limitations, the underlying medical malpractice claims were time barred, and thus any representations about the May 7 petition's being the original were immaterial.

### 1.

To prove mail fraud under § 1341, the government must show (1) a scheme to defraud; (2) the use of the mails to execute the scheme; and (3) the specific intent to defraud. *United States v. Bieganowski*, 313 F.3d 264, 275 (5th Cir. 2002). "In addition, the Supreme Court has interpreted section 1341 to require that the misstatement made in the course of the scheme to defraud be a material one." *Id.* (citing

*Neder v. United States*, 527 U.S. 1 (1999)).[24] Because Holmes limits his attack to the materiality of the alleged misrepresentations, we cabin our analysis accordingly.

### 2.

When the defense in the underlying tort suit moved for summary judgment asserting that Hector Gonzalez's suit was time-barred as of May 11, 1996, Holmes was taking a position completely contrary to what he urges now. Indeed, in his opposition to summary judgment, Holmes repeatedly pointed to the May 7, 1996, filing date as defeating Aleman's limitations defense. Consider, for example, the following passages from Holmes's pleading:

The Defendant admits on page six of his motion that the last date to file would have been May 11, 1996. Assuming this date to be true, the filing of the Plaintiffs Petition on May 7, 1996 would have been timely.

. . .

Alternatively, assuming arguendo that the last date of treatment was February 25, 1994, as asserted by the Defendant then the limitations period would have extended to

---

[24] The mail fraud statute expressly applies to a "scheme or artifice to defraud another of the intangible right of honest services." 18 U.S.C. § 1346. The government entered into evidence the constitutional oath of office taken by Gonzalez, *see* TEX. CONST. art. XVI, § 1, and the oath taken by Holmes as a condition of membership in the State Bar of Texas, *see* TEX. GOV'T CODE ANN. § 82.037. The court also instructed the jury that tampering with or fabricating government documents and committing perjury are prohibited by Texas law. Holmes does not, however, raise any challenge to the applicability of the intangible services doctrine to the facts at hand.

May 10, 1996, which would have been three days after the filing of the Plaintiffs Petition.

Despite these representations, which plainly contemplate the May 11 date as viable for limitations purposes, Holmes characterizes the evidence adduced at trial supporting his assertion that either date was beyond the limitations period as "overwhelming." His brief, however, fails to cite any record evidence supporting this claim. Our independent review of the record indicates that, during the defense's cross-examination of Hole and again during closing argument, the defense attempted to use the materials submitted by Hole to the state bar to establish that limitations had expired as of either date.

Specifically, the defense pointed to a chronology of events included in the file prepared by Hole, which indicates that on April 3, 1996, the "SOL runs on last non-barred negligence claim," and includes a notation that "Mr. Holmes was correct that the statute on the 01/08/94 visit would have expired on 04/03/96 not 05/04/96 as originally indicated." From this single entry, the defense claimed that the limitations period expired in April, and thus argued to the jury that Holmes had no motive to fabricate a petition with a May 7, 1996, date-stamp.[25]

Holmes fails, however, to account for the next entry in that same chronology: On May 11, 1996, the chronology notes, the "SOL runs on last non-barred treatment date." Thus, contrary to Holmes's wholesale claim that the limitations period expired in April, Aleman's lawyers believed that claims calculated from the last date of treatment (pursuant to what the parties refer to in their summary judgment papers as the "continuing course of treatment doctrine"), rather than from the last date of *negligent* treatment, were potentially viable as a limitations matter until May 11, 1996.[26] And, as we indicated, this is precisely what Holmes asserted in his opposition to summary judgment.

Doubtless it is now (with the medical malpractice case long-since over, and sitting under two federal felony convictions) in Holmes's interest to disclaim his previous reliance on the so-called continuing course of treatment doctrine and to maintain that the suit would have been time-barred even on May 7, 1996.

---

[25] Defense counsel stressed the import of this notation to the jury during closing argument:

> I offered one exhibit into evidence and only one exhibit. . . . I offered . . . the document that Ron Hole offered to the state bar grievance committee. . . .
>
> [I]n that document he says very clearly that the statute of limitations was missed in
> (continued...)

[25](...continued)
April of 1996. In April. And he highlighted it. And it's there for you to read. He says, I agree. Mr. Holmes was right. The statute was missed in April.

[26] Hole testified to why the May 11 date was relevant during cross-examination:

> Q: Whether May 7th or May 14th is the filing date of the petition you had him on [the] statute of limitations?
>
> A: Not really. If the statute, if they go by the last date, under the continuing course of treatment doctrine, the last date would have brought the statute of limitations to May 11th, and that's why we said at the latest, May 11th.

But there was never any judicial resolution of the limitations question; instead, the record reflects a vigorous dispute as to the proper calculation of limitations. At the time, Aleman's lawyers were asserting that claims not filed by May 11 were time-barred; and Holmes responded by claiming that the suit was not time-barred because the petition filed on May 7SSthe fraudulent petitionSSwas timely filed.

Therefore, to the extent Holmes represented that the suit was filed on May 7, 1996, this representation could have saved him from a limitations bar had the state court ultimately accepted the view that the applicable trigger date was the last date of treatment, as Holmes himself pressed in his response to summary judgment.[27] That Holmes or even Hole may now regard this as unlikely is not controlling; that the May 11 date could have saved the suit from the time-bar then-being pressed by Aleman's defense counsel is. These representations thus were material, so we affirm Holmes's conviction of mail fraud.

---

[27] *Accord Neder*, 527 U.S. at 22 n.5 (quoting one formulation providing that a matter is material if "the maker of the representation knows or has reason to know that its recipient regards or is likely to regard the matter as important in determining his choice of action, although a reasonable man would not so regard it") (quoting RESTATEMENT (SECOND) OF TORTS § 538 (1977))); *Kungys v. United States*, 485 U.S. 759, 770 (1988) ("[A] concealment or misrepresentation is material 'if it has a natural tendency to influence, or was capable of influencing, the decision of' the decisionmaker to which it was addressed."); *United States v. Heath*, 970 F.2d 1397, 1403 (5th Cir. 1992) (stating that, in bank fraud context, "[a] statement is material if it 'has a natural tendency to influence, or was capable of influencing the decision of' the lending institution.") (quoting *Kungys*, 485 U.S. at 770)).

## V.

Holmes avers that the government's closing argument contained an improper plea for sympathy for Hector and Felipa Gonzalez, thereby prejudicing the jury against him to such a degree that he was denied a fair trial. We find no error.

## A.

"Improper prosecutorial comments constitute reversible error only where 'the defendant's right to a fair trial is substantially affected.'" *United States v. Bernard*, 299 F.3d 467, 488 (5th Cir. 2002) (quoting *United States v. Andrews*, 22 F.3d 1328, 1341 (5th Cir. 1994)). "A criminal conviction is not to be lightly overturned on the basis of a prosecutor's comments standing alone. The determinative question is whether the prosecutor's remarks cast serious doubt on the correctness of the jury's verdict." *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989).

To resolve this question, we consider the magnitude of the prejudicial effect of the challenged statements, the efficacy of any cautionary instructions, and the strength of the evidence of the defendant's guilt. *Bernard*, 299 F.3d at 488 (citing *Andrews*, 22 F.3d at 1341). This already narrow standard of review is further constrained by Holmes's failure to object; he bears the burden of demonstrating that the prosecutor's statements constitute plain error. *See id.*; FED. R. CRIM. P. 52(b).

## B.

Holmes has failed to demonstrate error, much less plain error. The prosecutor's lengthy closing argument, viewed in its entirety and in context of the charged offenses, is not primarily an appeal to the jurors' emotions regarding Hector and Felipa Gonzalez; rather,

the prosecutor was attempting to underscore the situation Holmes found himself in, having missed the limitations period on an ostensibly serious and valuable medical malpractice claim.

The government therefore referred to the underlying malpractice suit as demonstrating Holmes's *motive* for conspiring with Pauline Gonzalez to back-date a fraudulent petition. Thus, although the government's closing argument undoubtedly contains certain statements that tend to evoke sympathy for Hector and Felipa Gonzalez, the subject of the malpractice suit, including its meritsSSand therefore the seriousness of the injury suffered by Hector Gonzalez, and the value that injury would have in such a suitSShas obvious relevance beyond an *argumentum ad misericordiam*.

And once it is accepted that the merits of the underlying malpractice suit bear on Holmes's motive, the propriety of the prosecutor's statements becomes a question of degree. At that point, we must proceed in light of the "wide latitude" afforded counsel when presenting jury argument. *See United States v. Hernandez-Guevara*, 162 F.3d 863, 874 (5th Cir. 1998). Here, given the district court's cautionary instruction to the jury to consider only the evidence and that the attorneys' arguments were not evidence, and the critical fact that these statements were "neither persistent nor pronounced when viewed within the context of the entire closing argument," *Bradford v. Whitley*, 953 F.2d 1008, 1013 (5th Cir. 1992), it is unlikely that the jury was led astray.[28] In

any event, there is substantial evidence supporting conviction on both counts. The prosecutor's unobjected statements do not produce reversible error.

## VI.

Holmes avers that his substantial rights were prejudiced by the government's delayed disclosure of Pacheco's report summarizing his March 2001 interview.[29] The government

---

[28] To the extent Holmes complains that the prosecutor's closing argument was improper insofar as it conveyed to the jury that Hector and Felipa Gonzalez were denied their "day in court" (continued...)

[28](...continued) not as a consequence of his conceded legal malpractice, but, rather, as a result of his illegal actions, this argument is also meritless. The prosecutor did not argue that they were denied their chance to have their case heard in court as a consequence of the charged crimes; to the contrary, the prosecutor argued that "the reason they never got the same chance their lawyer got this week [to have their case heard in court] is that their lawyer made a mistake. *And then he compounded that mistake by violating the law*."

[29] The report at issue consists of two paragraphs from a longer report prepared by Pacheco on the details of his investigation of the Hidalgo County Clerk's Office. Paragraphs 5.1 and 5.2 of the report summarize Pacheco's March 26, 2001, interview of Holmes, and read in full as follows:

On 03-26-01, writer interviewed attorney Lassiter HOLMES at the Texas Ranger office in McAllen. Present during the interview was his attorney, Joe CONNORS. HOLMES said that he had mailed the petition on 05-07-1996. He said that contrary to what had been said, the statute of limitations had nothing to do with this case.

HOLMES advised that he had gone on several occasions to try and get a copy of the petition, but no one at the Clerk's office could find one. He finally took a copy of the original (continued...)

concedes the delayed disclosure and resulting violation of Federal Rule of Criminal Procedure 16(a)(1)(A).

### A.

The standard of review for discovery matters is steep. "We review alleged errors in the administration of discovery rules under an abuse of discretion standard and will not reverse on that basis unless a defendant establishes prejudice to his substantial rights." *See United States v. Ellender*, 947 F.2d 748, 756 (5th Cir. 1991) (citing *United States v. Garcia*, 917 F.2d 1370, 1374 (5th Cir. 1990)).[30]

### B.

The district court rejected Holmes's post-trial claim holding that he failed to demonstrate prejudice to his substantial rights because defense counsel had ample time to review the report, make Holmes aware of its contents, and prepare him for any questions concerning the report on cross-examination.[31] Moreover, the district court characterized as disingenuous Holmes's claim that the delayed

---

[29](...continued)

petition to the Clerk's office so that they could see what petition he was talking about.

[30] *See also United States v. Johnson*, 127 F.3d 380, 391 (5th Cir. 1997) ("Delayed production is not in and of itself grounds for reversal of conviction. Prejudice to the substantial rights of a defendant is required before reversal of conviction is warranted.").

[31] The district court determined that "there appears to be no dispute that the Pacheco Report was provided to defense counsel during the trial but before the defense had started to present any evidence." Holmes's brief, however, suggests that the report was not disclosed until after a break taken *during* the course of Holmes's direct testimony.

disclosure undermined the defense strategy and theory of the case; the court observed that Holmes could not have been blind-sided by the contents of a report summarizing a meeting he attended with his attorney; in fact, the district court noted that the defense had a lengthy, contemporaneous report Holmes had prepared about the interview.

### C.

Holmes now contends his substantial rights were prejudiced insofar as he was forced to decide whether to testify in his own defense before he received a copy of Pacheco's report. Holmes claims that the central defense theory of the case turned on proving that someone in the clerk's office had back-dated (without his knowledge or encouragement) the petition he had brought as a reference; but because he was unaware of the existence of Pacheco's written summary of the interview where he had explained this story, he felt forced to testify.

As a threshold matter, there is no merit to Holmes's suggestion that had he known about Pacheco's written summary of his interview he could have relied solely on that report, could have refrained from taking the stand, and still would have adequately presented his defense theory to the jury. Pacheco's written summary is not sufficient by itself to present Holmes's "go-by" theorySSit states that Holmes claimed to have brought a "copy" of the petition to the clerk's office; it does not, however, explain why this "copy" was signed and printed as an original. Indeed, it was only when Holmes testified on direct examination that the jury was treated to his explanation for this seeming irregularity:

Q: Ordinarily, how do you handle your copies, copies of petitions that are in your file?

A: I sign them.

Q: Why?

A: I like signing my names [sic] toSSon the pleadings. I just like doing it.

Moreover, Pacheco's written summary of Holmes's statement is wholly insufficient to provide an exculpatory answer to *any* of the other critical questions in this case, questions that only Holmes was competent to testify about. Only he could testify to the alleged preparation of the petition and envelope on May 6, 1996, which he claims to have done alone; or the alleged mailing of that (still undiscovered) petition. Only he could explain what he actually was inquiring of Gomez, who testified that Holmes asked her to back-date and file a pleading; or the many occasions on which he claims to have gone (although no other witness was able to corroborate these periodic stops) to the clerk's office to inquire about his missing petition; or why he told Aleman's lawyer and insurance adjustor he was going to file the suit "today" on May 14, 1996, if he had in fact already mailed a petition and was referring only to the filing of an expert report; or why, if he had in fact mailed an earlier petition, he did not style the petition filed on May 14, 1996, "First Amended Petition" or something similar.

It is therefore implausible to credit Holmes's suggestion that timely disclosure of Pacheco's written summary of his interview would have rendered Holmes's testimony unnecessary such that the delay prejudiced his substantial rights.[32] Thus, although we have

indicated that the delayed disclosure of a report within rule 16's mandate of disclosure may be prejudicial if a defendant has to decide whether to testify before becoming aware of the statement's particulars,[33] Holmes cannot credibly suggest that he would not have testified had the government produced the document in a timely manner. Absent such prejudice, the delayed disclosure is not reversible error.

## VII.

Holmes challenges the denial of his motion for a new trial based on newly-discovered evidence. We reject his claim.

### A.

Holmes points to the deposition of Claude Hildreth, a private investigator, taken during discovery in the legal malpractice suit. Holmes contends that Hildreth's deposition testimony reveals that he was instructed by Hole and Alvarez to contact Hector and Felipa Gonzalez and to inform them of Holmes's misconduct related to the filing of their medical malpractice lawsuit. According to Holmes, this

---

[32] Our conclusion is bolstered by the testimony of Holmes's own trial counsel when asked at the (continued...)

[32](...continued)
post-trial motions hearing about the delayed disclosure and its impact, if any, on trial strategy:

Q: Would your strategy about putting Lassiter Holmes on the stand have changed?

A: Probably Not.

[33] *See, e.g.*, *United States v. Gonzalez*, 967 F.2d 1032, 1036 (5th Cir. 1992) (rejecting claim for lack of prejudice where particulars of statement became known prior to decision about whether to testify); *United States v. Arcentales*, 532 F.2d 1046, 1050 (5th Cir. 1976) ("We think it highly significant that the inculpatory statement became known during the government's case-in-chief.").

testimony contradicts Hole's and Alvarez's testimony and lends credence to Holmes's theory that Hole and Alvarez "were pursuing a vendetta against him."

Alvarez testified that she felt precluded as a matter of professional ethics—given her role as opposing counsel in the underlying medical malpractice suit—from contacting Hector and Felipa Gonzalez to relate the truth about their lawsuit. She did, however, testify that she "felt obliged" to write a letter to the editor of a local McAllen newspaper setting out then-mayoral candidate Bobby Garcia's involvement in and awareness of Holmes's conduct in the underlying medical malpractice suit after viewing a campaign advertisement portraying him as "the candidate . . . who stood for . . . good ethical practice and honesty and integrity in the mayor's office." It was after reading this letter to the editor, Hole testified, that Hector and Felipa Gonzalez contacted his office, and it was only then that Alvarez referred them to an attorney to pursue a legal malpractice suit against Holmes.

### B.

We review the denial of a motion for new trial for abuse of discretion, *see, e.g.*, *United States v. Blackthorne*, 378 F.3d 449, 452 (5th Cir. 2004), and we subject new trial motions based on newly-discovered evidence to "an unusually stringent substantive test," *United States v. Ugalde*, 861 F.2d 802, 808 (5th Cir. 1988). Namely, under the so-called *Berry* rule, a defendant is not entitled to a new trial on the basis of newly-discovered evidence unless he demonstrates that (1) the evidence is newly discovered and was unknown to him at the time of trial; (2) the failure to discover the evidence was not due to his lack of diligence; (3) the evidence is not merely cumulative or impeaching, but is material; and (4) the evi-

dence would probably produce an acquittal. *See United States v. Freeman*, 77 F.3d 812, 816 (5th Cir. 1996) (citing *Berry v. Georgia*, 10 Ga. 511 (1851)).

### C.

Holmes cannot satisfy these standards. Leaving aside the question of diligence,[34] whether a private investigator caused Hector Gonzalez to contact Alvarez, and whether the investigator was directed to do so by Hole or Alvarez, do not bear on whether Holmes committed the charged offenses. Indeed, as the district court noted, "even if Mr. Hole did everything in his power to ensure that Mr. Gonzalez brought a legal malpractice claim against [Holmes], this fact could not affect [Holmes's] guilt or innocence."

To be sure, Hildreth's testimony would have provided some support to Holmes's claim that Hole had a vendetta against him. Nevertheless, insofar as this evidence only casts doubt on the veracity of Hole's and Alvarez's testimony regarding their contact with Hector and Felipa Gonzalez and demonstrates a bias on the part of Hole—standard methods of impeachment—it is merely impeachment evidence, and therefore insufficient to entitle Holmes to a new trial. *See, e.g.*, *Blackthorne*, 378 F.3d at 454–55. In any event, given the substantial evidence support-

---

[34] The government contends that Holmes was not diligent in acquiring this evidence, noting that Holmes has failed even to identify when he became aware of Hildreth's testimony. Moreover, the government contends that because the legal malpractice suit against him has been pending in state court since 2001, whereas the instant criminal action was not indicted until July 2002 and not tried until January 2003, Holmes (in defending the civil suit) could have deposed Hole, Alvarez, and Hildreth before his criminal trial.

ing the verdict beyond the testimony of Hole and Alvarez, this impeachment evidence does not have any tendency to undermine the outcome.

## VIII.

Holmes contends that his trial counsel provided ineffective assistance under the Sixth Amendment. This assertion is without merit.

### A.

Holmes advanced his ineffective assistance claim in an amended motion for new trial in which he faulted counsel for failing to object to (1) the government's use of the Pacheco report on cross-examination; and (2) various instances of alleged prosecutorial misconduct. After a hearing, the district court denied relief, finding that Holmes had failed to satisfy even the first requirement of *Strickland v. Washington*, 466 U.S. 668 (1984)SSnamely, that counsel's performance was deficient.

The court referenced an affidavit of trial counsel submitted with Holmes's motion[35] that characterized the failure to object to certain perceived errors as deliberate trial strategy. Relying on our precedent foreclosing reliance on informed tactical decisions except in the most exceptional circumstances as a basis for

claims of ineffective assistance,[36] the court faulted Holmes for trying to "have it both ways," *i.e.*, "using a deliberate, reasonable strategy at trial, and then relying on that same strategy as grounds for a new trial."

### B.

Holmes charts a different tack on appeal. He now faults counsel for, as his brief puts it, deciding to be "'Mr. Nice Guy' . . . agreeable to everybody except his client." He claims that counsel (1) without objection allowed the case to be tried in Houston as opposed to McAllen or Laredo, and then lied to Holmes about the circumstances of the Houston venue selection;[37] (2) failed to conduct a proper investigation of certain "important materials";[38] and (3) subjected Holmes to "outrageous and improper cross-examination covering as much

---

[35] Trial counsel's affidavit provides, in part:

During the cross-examination of my client I had to make several tactical decisions. One of which was whether I would object to certain questions propounded to my client that I felt were improper. I decided I would not object because my client was a lawyer. I felt my constant objecting might hurt the jury's view of him and his credibility.

[36] *See, e.g.*, *Cotton v. Cockrell*, 343 F.3d 746, 752–53 (5th Cir. 2003) ("A conscious and informed decision on trial tactics and strategy cannot be the basis for constitutionally ineffective assistance of counsel unless it is so ill chosen that it permeates the entire trial with obvious unfairness.") (quoting *United States v. Jones*, 287 F.3d 325, 331 (5th Cir. 2002) (quoting *Garland v. Maggio*, 717 F.2d 199, 206 (5th Cir. 1983))).

[37] Although counsel informed the court that Holmes preferred to be tried in McAllen, Holmes alleges that counsel nevertheless told the court that there was no objection to venue in Houston after the prosecutor informed the court that he was based in Houston. Holmes further alleges that counsel lied to him when he said that the Houston venue selection was decided by order of the court.

[38] Holmes refers to (1) a report by his former attorney, Joe Connors, made in preparation for a potential state criminal prosecution before the federal indictment was handed down; and (2) an expert opinion prepared by an attorney on the statute of limitations question.

as seven or eight hours over a period of two days."

Because Holmes did not present to the district court his claims concerning counsel's handling of venue and failure to investigate, we must determine as a threshold matter whether to address these claims. Our controlling precedent generally precludes review on direct appeal of ineffective assistance claims in the absence of presentment to the district court and an adequately developed record. *See, e.g.*, *United States v. Navejar*, 963 F.2d 732, 735 (5th Cir. 1992).[39]

Although the record does contain testimony at the post-trial hearing on the question of venue and on counsel's failure to investigate certain materials, these claims were not presented to the district court as grounds for relief. Because the record on these issues is incomplete and inadequate for proper appellate review, we decline to reach them. We also express no opinion as to their merit *vel non*.

To the extent, however, that Holmes's complaints regarding cross-examination and counsel's passivity overlap and restate the claim actually developed and presented to the

district court based on counsel's failure to object to various instances of prosecutorial misconduct, we reject Holmes's claim. His briefing on this issue is devoid of serious analysis. He does not address the district court's findings regarding trial counsel's apparent deliberate strategy of passivity. Nor does he provide even a single citation to even a single example of improper cross-examination by the prosecutor and a possible valid objection counsel could have raised. Instead, Holmes merely concludes that counsel's performance constitutes "an utter perversion of the attorney-client relationship."

This bare assertion will not suffice. To succeed on his ineffective assistance claim, Holmes bears the burden of demonstrating that counsel's performance was deficient and that the deficient performance prejudiced his defense. Holmes cannot escape this burden merely by stating his conclusion. "Mere conclusory allegations in support of a claim of ineffective assistance of counsel are insufficient to raise a constitutional issue." *Green v. Johnson*, 160 F.3d 1029, 1042 (5th Cir. 1998).

### IX.
### A.

The presentence report ("PSR") grouped the two counts of conviction and applied the 1998 version of the sentencing guidelines. The PSR scored Holmes at a base offense level of 10 under U.S.S.G. § 2C1.7 and enhanced his offense level by eight levels because the offense involved an elected official or official holding a high-level decision-making or sensitive position pursuant to U.S.S.G. § 2C1.7(b)(1)(B), for a total offense level of 18. Holmes had a criminal history score of I, yielding a punishment range of 27 to 33 months' imprisonment.

---

[39] *See also Massaro v. United States*, 538 U.S. 500, 504–05 (2003) ("[I]n most cases, a motion brought under § 2255 is preferable to direct appeal for deciding claims of ineffective-assistance. When an ineffective-assistance claim is brought on direct appeal, appellate counsel and the court must proceed on a trial record not developed precisely for the object of litigating or preserving the claim and thus often incomplete or inadequate for this purpose."); *United States v. Cornett*, 195 F.3d 776, 781 n.2 (5th Cir. 1999) ("[A]n ineffective assistance of counsel argument should not be raised for the first time on appeal except in rare cases where the record is fully developed.").

The government filed a written objection to the PSR's failure to recommend a two-level enhancement for obstruction of justice pursuant to U.S.S.G. § 3C1.1, because Holmes had falsely testified under oath during his trial. The court sustained the objection. Thus, Holmes's offense level was increased to 20, yielding a range of 33 to 41 months. The court sentenced Holmes to concurrent 33-month terms and three years' supervised release.[40]

A few days later, the court held a telephonic conference with all counsel and Holmes. As the transcript of the call reveals, the court "wanted to revisit the obstruction of justice enhancement . . . to make absolutely sure that the Court had been sufficiently specific about the statements that the Court believes to be perjurious." The court thus systematically identified each of the statements it found to be false and therefore to be providing the basis for the two-level enhancement.[41]

---

[40] The district court further ordered Holmes to pay a $5,000 fine for each count of conviction and a special assessment of $200.

[41] The transcript reads, in pertinent part, as follows:

The Court finds and holds that the following statements do meet [the] criteria for perjury:

The testimony by Mr. Holmes that he mailed an original petition on May 6, 1996.

The testimony that on May 14th, 1996, Mr. Holmes asked the clerks to look up the cause number on the case, and when they couldn't find it, he filed the second petition.

Thirdly, the testimony that Mr. Holmes
(continued...)

---

[41](...continued)
received a phone call from the Clerk's Office, possibly from Mrs. Gonzalez herself stating that the petition had been found bearing the May 7th date.

Fourth, the testimony that Mr. Holmes asked unnamed clerks to look for the 'missing' petition and finally gave a signed copy of the quote, 'missing petition' to the Clerk's Office as a go-by.

The Court also finds that there were numerous misstatements made about how the check number found its way onto the May 7th petition. At trial, for example, Mr. Holmes said he put the check number on the file copy at the same time that he signed it.

In his deposition Mr. Holmes stated he wrote the check number on the petition eight months earlier, when the petition was already in the possession of the Clerk's Office. This explanation, of course, became impossible once the watermark evidence came to light.

At trial Mr. Holmes attempted to disavow his deposition testimony by stating that he was confused because Mr. Ron Hole, had made an unclear copy of the petition. Therefore, his testimony about the filing-fee dispute supposedly pertained to a different case.

However, Mr. Holmes repeatedly stated during the course of the deposition that the deposition was supposed to be limited to the topic of the May 7th document and the filing of the document, and he refused to answer, repeatedly, questions that he considered off-topic.

Therefore, the Court finds that he could not possibly have thought that the testimony about the filing-fee dispute pertained to a different case.
(continued...)

## B.

In his initial brief on appeal, Holmes, on two grounds, challenges as clear error the two-level sentencing enhancement for obstruction of justice. First, he avers that certain statements found to be false by the district court are not so; and second, he asserts that, even if false, his deposition testimony cannot not form the basis for the perjury enhancement, because the deposition was taken before any official investigation.

### 1.

"We review a district court's finding of obstruction of justice for clear error." *United States v. Powers*, 168 F.3d 741, 752 (5th Cir. 1999). "A factual finding is not clearly erroneous as long as it is plausible in light of the record as a whole." *Id.* (quoting *United States v. Cluck*, 143 F.3d 174, 180 (5th Cir. 1998)). "This is particularly true where a sentencing court's imposition of a § 3C1.1 enhancement is based, at least in part, upon an evaluation of a witness' credibility." *Id.* (citing *Johnson v. Collins*, 964 F.2d 1527, 1532 (5th Cir. 1992)).

### 2.

Holmes attempts to show clear error by essentially repeating his version of the events in question, maintaining that neither his claim to have brought the ultimately back-dated peti-

tion to the clerk's office as a go-by nor his claim to have mailed the original petition on May 6, 1996, was controverted by the evidence at trial. These claims were apparently unconvincing to the jury, and there is more than ample evidence supporting the district court's determination that these statements, among others, were false. This is particularly true given that Holmes was the key witness in his own defense, setting his own story of the events in question against the entirety of the government's case, and therefore the district court's perjury conclusion is based substantially on a determination about Holmes's credibility.[42]

### X.

This does not, however, end the sentencing inquiry. During the pendency of this appeal, the Supreme Court decided *United States v. Booker*, 125 S. Ct. 738 (2005), and Holmes has raised, in supplemental briefing, a constitutional challenge, asserting that his sentence is infirm because it was enhanced based on (1) a judicial finding that his offense involved an elected official under U.S.S.G. § 2C1.7(b)-(1)(B) and (2) a judicial finding that he obstructed justice by committing perjury under U.S.S.G. § 3C1.1.

### A.

Holmes did not object to his sentence on Sixth Amendment grounds in the district court,

---

[41](...continued)

Further, if the trial-story told by Mr. Holmes at trial were true, Mr. Holmes should have known he was looking at the 'go-by' as soon as he saw the check number, because he did not write that on the original, only on his own file copy, which became the go-by.

So I believe all of these statements were and are false.

[42] Because the district court's findings that Holmes lied at trial about, *inter alia*, mailing the petition on May 6, 1996, and having given the back-dated petition to someone in the clerk's office as a "go-by" are not clearly erroneous, we need not resolve Holmes's further claim that any false statements from his deposition testimony cannot properly form the basis of an obstruction of justice enhancement.

22

so our review is for plain error. *See, e.g.*, *Booker*, 125 S. Ct. at 769; *United States v. Mares*, 2005 U.S. App. LEXIS 3653, at *22 (5th Cir. Mar. 4, 2005). Under plain error review, we may not correct an error not raised in the district court unless there is (1) an error; (2) that is plain; and (3) that affects substantial rights. *See, e.g.*, *Johnson v. United States*, 520 U.S. 461, 466–67 (1997). "If all three conditions are met, an appellate court may then exercise its discretion to notice a forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *Id*. at 467 (alternation in original) (internal quotation marks omitted) (quoting *United States v. Olano*, 507 U.S. 725, 732 (1993)).

### B.

Holmes first contends that the eight-level enhancement for an offense involving an elected-official under U.S.S.G. § 2C1.7(b)(1)(B) is error under *Booker*. He contends that the jury verdict alone did not find that Pauline Gonzalez was an elected official. This is frivolous. Holmes admitted as much at trial, and that is all *Booker* requires.[43]

---

[43] Consider, for example, Holmes's testimony on direct examination when asked to whom he addressed the envelope in which he claims to have mailed the "original" May 6, 1996 petition:

Q: Would you have mailed it to Pauline Gonzalez or Hidalgo County District Clerk's Office?

A: No, it would have been to her.

Q: Why?

A: Because everything is addressed to the district clerk.

(continued...)

### C.

Holmes next contends that the two-level enhancement for obstruction of justice based on his perjury at trial under U.S.S.G. § 3C1.1 is error under *Booker* because the jury was never presented with the question whether he obstructed justice. Insofar as the jury was not specifically asked and instructed to find beyond a reasonable doubt (as is required with the elements of charged offenses) whether Holmes committed perjury while on the stand, and thus obstructed justice, imposing this enhancement under a mandatory guidelines regime was error under the Sixth Amendment.[44]

---

[43](...continued)
Q: And she is the district clerk?

A: Yes, sir.

Or consider the closing jury argument where defense counsel put the following question to the jury: "Why would Pauline Gonzalez, respected in that community . . . [and] elected for at least two decades to public office, risk her public reputation, her public office, and her freedom for nothing?"

[44] *Accord Blakely*, 124 S. Ct. at 2540 n.11 ("Why perjury during trial should be grounds for a judicial sentence enhancement on the underlying offense, rather than an entirely separate offense to be found by a jury beyond a reasonable doubt (as it has been for centuries, see 4 W. BLACKSTONE, COMMENTARIES ON THE LAWS OF ENGLAND 136–38 (1769)), is unclear."). The Eleventh Circuit has recently suggested, in *dictum*, that an obstruction of justice enhancement imposed on a defendant who took the stand and falsely denied his guilt may not be *Booker* error, "because the jury verdict convicting [him] of the crimes he denied necessarily, albeit implicitly, found that he had engaged in behavior that fits within § 3C1.1." *United States v. Rodriguez*, 398 F.3d 1291, 1298 n.5 (continued...)

[44](...continued)

(11th Cir. 2005). Having found beyond a reasonable doubt that the back-dating and filing of the petition was the object and consequence of an illicit conspiracy, the jury in the instant case, it could be said, necessarily found that Holmes was lying when he testified that he had provided that petition to the clerk's office as a go-by during the search for the alleged "missing petition."

Though we agree that the jury necessarily rejected the veracity of Holmes's story, the sentencing enhancement imposed by the district court based on its determination that he committed perjury cannot be saved from a finding of constitutional error under *Booker* by reference to the jury's guilty verdict on the charged offenses. A finding of perjury within the meaning of U.S.S.G. § 3C1.1 requires more than a conclusion that the defendant's story of events is not credible; indeed, the Supreme Court has given meaning to the term "perjury" for guidelines purposes by borrowing the elements of perjury from the federal perjury statute. *See United States v. Dunnigan*, 507 U.S. 87, 94 (1993) ("In determining what constitutes perjury, we rely upon the definition that has gained general acceptance and common understanding under the federal criminal perjury statute, 18 U.S.C. § 1621."); *id.* ("A witness testifying under oath or affirmation violates this statute if she gives false testimony concerning a material matter with the willful intent to provide false testimony, rather than as a result of confusion, mistake, or faulty memory.") (citing 18 U.S.C. § 1621(1)). As a result, the Court has required district courts to make a finding of obstruction of justice "that encompasses all of the factual predicates for a finding of perjury," or, when faced with a defendant's objection to a perjury enhancement, "to address each element of the alleged perjury in a separate and clear finding." *Id.* at 95.

As we indicated with respect to Holmes's initial nonconstitutional challenge to the perjury enhance-
(continued...)

Because there was error, the second prong of plain error review requires us to determine whether the error was plain. *Johnson*, 520 U.S. at 467. Although the error was not "plain" at the time of sentencing, it is now plain in light of *Booker*.[45]

We therefore turn to the third prong of plain error review: whether the error affects substantial rights, which "means that the error must have been prejudicial: It must have affected the outcome of the district court proceedings." *Olano*, 507 U.S. at 734. And "[i]t is the defendant rather than the Government who bears the burden of persuasion with respect to prejudice." *Id.*[46]

To carry this burden, a defendant must show "'a reasonable probability that, but for

[44](...continued)

ment, there is more than ample evidence in the record to support the district court's thorough perjury findings. Nevertheless, because the enhancement was imposed under mandatory guidelines and the *jury* was not specifically asked and instructed to find beyond a reasonable doubt whether Holmes had committed perjury based on the foregoing elements, there is *Booker* error. So although we harbor little doubt that, if so asked and instructed, the jury would have reached the same conclusion as the district courtSS*i.e.*, that Holmes committed perjurySSthe requisite findings cannot be projected onto the jury's guilty verdict to cure the constitutional error.

[45] *See id.* at 468 ("[W]here the law at the time of trial was settled and clearly contrary to the law at the time of appeal[,] it is enough that the error be 'plain' at the time of appellate consideration.").

[46] *See also United States v. Dominguez Benitez*, 124 S. Ct. 2333, 2340 (2004) ("[T]he burden of establishing entitlement to relief for plain error is on the defendant claiming it . . . .").

[the error claimed], the result of the proceeding would have been different.'" *Dominguez Benitez*, 124 S. Ct. at 2339 (alteration in original) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "A defendant must thus satisfy the judgment of the reviewing court, informed by the entire record, that the probability of a different result is 'sufficient to undermine confidence in the outcome.'" *Id.* at 2340 (quoting *Washington*, 466 U.S. at 694).

In assessing whether a defendant has carried his burden of showing prejudice, we must, as this court in *Mares* and the Eleventh Circuit in *Rodriguez* have cogently explained, keep in mind precisely what isSSand thus what is notSSerror under *Booker*. The precise Sixth Amendment error identified in *Booker* is *not* the use of extra-verdict enhancements that increase a sentence; the constitutional error is that extra-verdict enhancements were being used under mandatory guidelines. *See Mares*, 2005 U.S. App. LEXIS 3653, at *27; *Rodriguez*, 398 F.3d at 1300.

Thus, in applying the third prong, "the pertinent question is whether [the defendant] demonstrated that the sentencing judgeSSsentencing under an advisory scheme rather than a mandatory oneSSwould have reached a significantly different result." *Mares*, 2005 U.S. App. LEXIS 3653, at *27-*28. Absent some indication in the record that the outcome would have been different if the district court had been operating under an advisory system, a defendant fails to carry his burden of demonstrating prejudice and therefore that the error affected his substantial rights.[47]

---

[47] *See Mares*, 2005 U.S. App. LEXIS 3653, at *28 ("[T]here is no indication in the record from (continued...)

Holmes attempts to demonstrate prejudice by quoting the following statement apparently made by the district judge at sentencing:

> Those who practice in my court have heard me say many times that I generally think the guidelines provide punishments that are far too harsh. . . . I also think that I took an oath to apply the law faithfully. And I don't have a free-ranging portfolio to ignore the sentencing table.

The problem for Holmes is that he failed to include in the record on appeal the transcript of that hearing.[48] As a result, even if the alleged quoted statement constituted a sufficient basis for Holmes to carry his burden of demonstrating prejudice (a question we do not answer), it is not in the record on appeal and thus cannot

---

[47](...continued)
the sentencing judge's remarks or otherwise that gives us any clue as to whether she would have reached a different conclusion. Under these circumstances the defendant cannot carry his burden of demonstrating that the result would have likely been different had the judge been sentencing under the *Booker* advisory regime rather than the pre-*Booker* mandatory regime."); *see also Jones v. United States*, 527 U.S. 373, 394–95 (1999) ("Where the effect of an alleged error is so uncertain, a defendant cannot meet his burden of showing that the error actually affected his substantial rights.").

[48] Instead, he included only (as relevant here) the transcript from the December 17, 2003, telephonic conference in which the court specified its rationale for its previous decision to impose the enhancement; but, critically, the transcript from this conference reveals no similar statements by the district judge about being bound by the mandatory guidelines to apply a sentence he deemed so severe.

form the basis for a finding of prejudice.[49] Nor has Holmes identified any other basis in the record to suggest that the outcome would have been different if the district court had been operating under an advisory guidelines system. Holmes has therefore failed to carry his burden as to the third prong of the plain error test.

There is no reversible error in the conviction and no plain error in the sentence. The judgments of conviction and sentence are AFFIRMED.

---

[49] *See* FED. R. APP. P. 10(b)(1)(A) (stating that the appellant must order "transcript of such parts of the proceedings not already on file as the appellant considers necessary"); *United States v. Hinojosa*, 958 F.2d 624, 632 (5th Cir. 1992) ("We are unable to consider [defendant's sentencing challenge] because [he] has not provided this Court with a record of the sentencing hearing, and no justification is given for not doing so."); *Brookins v. United States*, 397 F.2d 261, 261 (5th Cir. 1968) ("This appellate court '[C]an only take the record as it finds it, and cannot add thereto, or go behind, beyond, or outside it, and it will not prosecute and independent inquiry' as to what happened in the lower court . . . .") (quoting 4A CORPUS JURIS SECUNDUM, APPEAL AND ERROR § 1206, at 1333)); *United States v. Narvaez*, 38 F.3d 162, 167 (5th Cir. 1994) ("It is the appellant's responsibility to order parts of the record which he contends contain error and his failure to do so prevents us from reviewing this assignment of error."); *id.* ("As the district court relied upon such evidence and as [defendant] failed to order that portion of the record, this court is precluded from reviewing his allegation."); *United States v. Johnson*, 584 F.2d 148, 156 n.18 (6th Cir. 1978) ("It is the responsibility of appellants to insure inclusion in the record of all trial materials upon which they intend to rely on appeal.").