# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**
November 1, 2010

No. 10-50239

Lyle W. Cayce
Clerk

UNITED STATES OF AMERICA,

Plaintiff – Appellee

v.

THERESA ANN TOLLIVER,

Defendant – Appellant

Appeal from the United States District Court for the
Western District of Texas
No. 5:08-CR-614

Before KING, GARWOOD and DAVIS, Circuit Judges.

PER CURIAM:[*]

Theresa Tolliver was charged with and convicted of conspiring to commit interstate murder-for-hire in relation to the death of her estranged husband, Derrick Tolliver. She appeals, attacking her conviction on six different bases. For the following reasons, we AFFIRM her conviction.

## I.  FACTUAL AND PROCEDURAL BACKGROUND

### A.  Factual Background

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 10-50239

Defendant Theresa Tolliver and victim Derrick Tolliver were married in 1983.[1] Derrick was an active-duty member of the Air Force and stationed in San Antonio, Texas. In October 1998, Theresa and Derrick separated, and Theresa petitioned for divorce a few months later. The court issued a temporary restraining order, which, among other things, prevented either of the parties from entering the other's home without permission, prevented either party from changing the beneficiary on his or her life insurance policy, and granted primary placement of the couple's two minor children, Donald and Derrick Jr., to Derrick. This order was to remain in effect during the pendency of the divorce proceedings. In the fall of 2000, Theresa and Derrick agreed to a divorce settlement, and in November 2000, they were awaiting court approval of the settlement before the divorce could become final.

Around the time she initiated divorce proceedings, Theresa began dating Emanuel Fonzie, who was approximately 18 years her junior. According to the evidence presented at trial, in the fall of 2000, Theresa and Fonzie hatched a plan to have Derrick murdered before the court approved the divorce settlement and Theresa was no longer the beneficiary of Derrick's life insurance policies. The two planned to hire Fonzie's friend, Jeremy Farr, who lived in Arkansas, to commit the murder.

Sometime in late October or early November 2000, Fonzie called Farr in Arkansas, telling Farr that he had a "lick," or a job, for him. The two had several phone conversations wherein Fonzie agreed to pay Farr $50,000 to travel to San Antonio and murder Derrick. Fonzie then sent Farr a bus ticket to travel from Arkansas to San Antonio.

Farr arrived in San Antonio on November 17, 2000. After Farr arrived, Fonzie again offered to pay him to murder Derrick before Theresa and Derrick's

---

[1] For the sake of clarity throughout this section, we refer to the defendant as Theresa and the victim as Derrick.

No. 10-50239

divorce was finalized.  Fonzie promised Farr that he would be paid "when the check come in," meaning (according to Farr) when Theresa collected the proceeds from Derrick's life insurance policies.  Farr also met with Theresa, who confirmed that she wanted Farr to kill Derrick.

During the afternoon of November 20, 2000, Theresa brought Fonzie and Farr to Derrick's house under the pretense of retrieving extra clothes for Donald and Derrick Jr.  Derrick was not at home, and Derrick Jr. testified that he had to use a butter knife to open the door.  During the visit, Theresa showed Fonzie and Farr where they could safely wait for Derrick to arrive home, showed them how to enter and exit the yard, unlocked a window for them, and directed them where to park the car during the murder.  Theresa then brought the group to Randolph Air Force Base, where Derrick worked, and pointed out Derrick's car to Fonzie and Farr.

That evening, Fonzie and Farr went to Derrick's house to wait for him to arrive home.  They parked in a vacant driveway across the street, and Fonzie handed Farr a .380 handgun.  The two then entered the yard through a hole in the privacy fence.  Farr removed the screen from the window that Theresa had unlocked, and the two entered the house where they waited for Derrick.  While they waited, they ransacked the house to make it appear as though the house had been burglarized.  When Derrick entered the house, Farr fired two shots into his head, killing him instantly.  Farr and Fonzie then fled the scene.

The day after the murder, detectives questioned Theresa, Fonzie, and Farr about the murder.  Each gave a written statement, and all denied any involvement in Derrick's death.  On November 22, 2000, as Derrick's widow, Theresa received a "death gratuity" from the Air Force.  This payment is meant to cover immediate funeral and burial expenses of active-duty service members.

Farr stayed in San Antonio for several days before returning to Arkansas.  Before he left, Theresa purchased a sweater, a pair of jeans, and a CD for him

3

No. 10-50239

using the money she received from the Air Force. Fonzie also gave Farr between $200 and $500 in cash.

Following Derrick's death, Theresa made efforts to claim benefits under two separate life insurance policies. The first had a face value of approximately $150,000. Unbeknownst to Theresa, Derrick had changed the beneficiary from Theresa to her daughter, Hazel Tolliver, in July 2000. Hazel received the proceeds from that policy in February 2001. After Hazel received the money, she charged Theresa with making distributions to various family members. Theresa made some of the distributions, but spent approximately $75,000 of the money without Hazel's permission. During the summer of 2001, Theresa used some of the money to travel to Arkansas, Georgia, and Florida. While in Arkansas, Theresa made several ATM withdrawals, totaling approximately $2,800. According to Farr, Theresa paid him "a couple thousand" in cash during her visit.

The second policy had a face value of approximately $200,000. Theresa, still the named beneficiary at the time of Derrick's death, collected the proceeds from this policy in February 2002. After she received the life insurance proceeds, Theresa purchased several vehicles, including a Dodge Durango, a BMW, and a Lincoln LS. She did not pay Farr any more money.

## B.   Procedural Background

The murder case was cold for several years because detectives were never able to conclusively link Theresa, Fonzie, or Farr to Derrick's murder. In 2004, Farr was charged with murder in Texas state court when police received a tip from his friend. After a jury found him guilty, but prior to sentencing, Farr offered to cooperate with investigators in exchange for a lower sentence recommendation.

Based on the information supplied by Farr, Fonzie and Theresa were charged with murder in Texas state court. Fonzie was found guilty, but the

4

No. 10-50239

state charges against Theresa were dropped.  The federal government then indicted Theresa for conspiring to commit interstate murder-for-hire in violation of 18 U.S.C. § 1958(a).[2]

Theresa pleaded not guilty.  Farr testified against her at trial, but Fonzie did not.  Following a three-day jury trial, the jury rendered a guilty verdict.  The district court sentenced Theresa to life in prison and ordered her to pay restitution in the amount of $524,200.73.  She now appeals her conviction, raising six separate issues on appeal.

## II.  DISCUSSION

### A.    Rule 404(b) Objections

The defendant first challenges two evidentiary rulings made by the district court, arguing that the evidence was admitted in violation of Federal Rule of Evidence 404(b).  We review a district court's decision to admit or exclude evidence for abuse of discretion.  *United States v. Yi*, 460 F.3d 623, 631 (5th Cir. 2006).

Rule 404(b) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith."  "Other act" evidence is admissible only if (1) the evidence is "relevant to an issue other than the defendant's character," and (2) the evidence's probative value is not substantially outweighed by its undue prejudice to the defendant.  *United States v. Beechum*, 582 F.2d 898, 911 (5th Cir. 1978).

---

[2] The murder-for-hire statute provides:

Whoever travels in or causes another (including the intended victim) to travel in interstate or foreign commerce, or uses or causes another (including the intended victim) to use the mail or any facility of interstate or foreign commerce, with intent that a murder be committed in violation of the laws of any State or the United States as consideration for the receipt of, or as consideration for a promise or agreement to pay, anything of pecuniary value, or who conspires to do so, shall be fined under this title or imprisoned . . . .

18 U.S.C. § 1958(a).

No. 10-50239

Rule 404(b) is not implicated, however, where the other act evidence is intrinsic to the crime charged. *United States v. Garcia*, 27 F.3d 1009, 1014 (5th Cir. 1994). " 'Other act' evidence is intrinsic when the evidence of the other act and the evidence of the crime charged are inextricably intertwined or both acts are part of a single criminal episode or the other acts were necessary preliminaries to the crime charged." *United States v. Williams*, 900 F.2d 823, 825 (5th Cir. 1990) (citations omitted). "Intrinsic evidence is admissible to complete the story of the crime by proving the immediate context of events in time and place, and to evaluate all of the circumstances under which the defendant acted." *United States v. Rice*, 607 F.3d 133, 141 (5th Cir. 2010) (internal citations and quotations omitted).

*1.    Life Insurance Proceeds*

At trial the government presented evidence that the defendant misused life insurance proceeds belonging to her daughter, Hazel Tolliver. Derrick Tolliver changed the beneficiary on one of his life insurance policies from the defendant to Hazel in July 2000, just over three months before the murder and without the defendant's knowledge. Hazel was in prison at the time, and she charged her attorney and the defendant with distributing funds from the policy. Hazel asked that various family members receive a portion of the money, $5,000 be put in her commissary account, and the rest placed in a mutual fund for her own benefit. After making some of the requested distributions, the defendant placed only $1,200 in Hazel's commissary account and proceeded to spend the rest.

The district court did not abuse its discretion in admitting this evidence because the evidence was intrinsic to the crime charged. *See Williams*, 900 F.2d at 825. To prove that the defendant conspired to commit murder-for-hire, the government must demonstrate that the murder be committed in exchange for something of pecuniary value. Farr testified that the defendant gave him "a

couple thousand" dollars in cash during her stay in Arkansas the summer following the murder—money that the government showed came from an account containing the life insurance proceeds that belonged to Hazel. The evidence that the defendant took the money out of the life insurance proceeds helped the government establish the source of the funds used to pay Farr.

### 2.   *Temporary Restraining Order*

The district court also admitted evidence regarding a temporary restraining order (TRO) issued by the court in which the defendant's divorce proceeding was pending. The victim's divorce attorney testified that the TRO was a standard order typical of those entered in most, if not all, divorce cases. The TRO prohibited each party to the divorce from entering the other's home without permission. The defendant admits that she entered the victim's house on the afternoon of the murder with Fonzie and Farr, but she contends that the fact that she violated the TRO by entering the house is irrelevant "other act" evidence under Rule 404(b). We disagree.

The government presented evidence that the defendant went to the victim's house to pick up Donald and Derrick Jr. for visitation numerous times while the TRO was in place. Fonzie often accompanied the defendant, and neither of them would enter the victim's house. Instead, they abided by the TRO and waited outside. Farr testified at trial that on the day of the murder, the defendant took him and Fonzie to the victim's house to help them plan the crime, showing them how to enter and exit the yard, where to wait for the victim, and where to park the car. The defendant contends that the visit to the house was an innocent errand to retrieve clothing for the children;  but it was no coincidence that the one day the defendant chose to violate the TRO was the same day that the victim was murdered. Therefore, the evidence was arguably intrinsic.

Even applying Rule 404(b), though, the district court did not err in admitting the evidence. Farr testified that the reason for the group's visit to the victim's house was for the defendant to help plan the murder. The evidence is therefore relevant to the defendant's preparation and plan for the murder, an allowable purpose under Rule 404(b). And given that the TRO was a standard order issued in most divorce proceedings, the evidence was not overly prejudicial.

## B.   Admission of Fonzie's Out-of-Court Statements

During trial, the government offered several out-of-court statements made by Fonzie through two witnesses. The government presented Farr, who testified regarding conversations he had had with Fonzie over the telephone and in person in the days leading up to the murder. The government also presented Detective Arturo Cervantes, who had interviewed Fonzie the day following the murder. The defendant contends that the district court erred in admitting these statements under Federal Rule of Evidence 801(d)(2)(E) and that they were further inadmissible under the Confrontation Clause of the Sixth Amendment.

"We review the admission of evidence under Rule 801(d)(2)(E) for abuse of discretion." *United States v. Delgado*, 401 F.3d 290, 298 (5th Cir. 2005). We review alleged violations of the Confrontation Clause *de novo. Id.* at 299. We address the statements offered through each witness in turn.

### 1.   Farr

The government questioned Farr regarding statements Fonzie had made to him in the days leading up to the murder. Specifically, Farr testified that Fonzie called Farr in Arkansas, telling Farr that he had a "lick" for him and that he would pay Farr $50,000 to murder the victim. Farr also testified that he spoke with Fonzie after arriving in San Antonio and that Fonzie stated that the murder needed to happen before the divorce was final. Fonzie promised Farr that he would receive the money when the defendant received the proceeds of the life insurance policies.

No. 10-50239

The district court allowed Farr to testify regarding Fonzie's out-of-court statements, reasoning that they were co-conspirator statements admissible under Rule 801(d)(2)(E).[3]   To admit evidence under Rule 801(d)(2)(E), "[t]he government must prove by a preponderance of the evidence (1) the existence of a conspiracy, (2) the statement was made by a co-conspirator of the party, (3) the statement was made during the course of the conspiracy, and (4) the statement was made in furtherance of the conspiracy." *Delgado*, 401 F.3d at 298.

The defendant incorrectly argues that the government presented no evidence apart from the statements themselves to show that she conspired with Fonzie to have the victim murdered.  We find that the government presented ample evidence to establish the conspiracy and establish the defendant's participation in the conspiracy.  The government presented telephone records to corroborate Fonzie's calls to Farr.  Further, Farr testified that he spoke with the defendant herself, who confirmed Fonzie's statements about killing the victim. He also testified that the defendant showed Fonzie and Farr how to carry out the murder while they were in the victim's home.  Finally, the government presented evidence that Farr received cash payments from the defendant and Fonzie when they were traveling through Arkansas the summer after the murder.

The defendant also argues, illogically, that Fonzie's statements to Farr were not made in the course of or in furtherance of the conspiracy.  The offered out-of-court statements were Fonzie's statements to Farr that he had a job for Farr and that Farr would be paid to kill the victim.   Fonzie's out-of-court

---

[3] Rule 801(d)(2)(E) provides:

A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by a coconspirator of a party during the course and in furtherance of the conspiracy.   The contents of the statement shall be considered but are not alone sufficient to establish . . . the existence of the conspiracy and the participation therein of the declarant and the party against whom the statement is offered.

statements go to the heart of the conspiracy.  Therefore, the district court did not err in admitting the statements under Rule 801(d)(2)(E).

Nor are Fonzie's statements to Farr barred by the Confrontation Clause of the Sixth Amendment.  The Confrontation Clause bars only testimonial statements.  *Crawford v. Washington*, 541 U.S. 36, 68 (2004); *United States v. Holmes*, 406 F.3d 337, 348 (5th Cir. 2005).  Fonzie's statements to Farr were "made casually to a partner-in-crime" and were therefore not "testimonial" under the Confrontation Clause.  *Holmes*, 406 F.3d at 349; *see also Crawford*, 541 U.S. at 51 ("A person who makes a casual remark to an acquaintance" does not "bear[] testimony.").  Non-testimonial statements are governed by the rules of evidence, which, as noted above, allow admission of Fonzie's statements to Farr. *See Crawford*, 541 U.S. at 68.

### 2.    *Detective Cervantes*

The government questioned Detective Cervantes regarding the statement he had taken from Fonzie the morning after the murder and admitted the statement itself into evidence. Specifically, Fonzie told Detective Cervantes that he and Farr had been playing basketball at the time of the murder, that he had accompanied the defendant to the victim's house and to Randolph Air Force Base on the afternoon of the murder, and that he had accompanied the defendant to the police station the morning after the murder.  The defendant challenges the admission of Fonzie's statement under the Confrontation Clause.

Under *Crawford*, testimonial statements offered for their truth are subject to the Confrontation Clause, which requires "unavailability and a prior opportunity for cross examination."  541 U.S. at 68.  Statements not offered for their truth, even if testimonial in nature, are not subject to these protections. *Holmes*, 406 F.3d at 349 (allowing admission of prior deposition testimony because it was offered for its falsity, rather than its truth).  Here, much of Fonzie's statement to Detective Cervantes was not offered for its truth.  Rather,

10

it was offered to show that Fonzie gave a false alibi (the same one given by Farr) when questioned regarding his whereabouts during the murder. Fonzie's statements offered for their falsity were therefore properly admissible. *See id.* at 350.

It is unclear whether the Confrontation Clause protects against admission of the remainder of the statement that was offered for its truth. In *Crawford*, the Court stated that "[s]tatements taken by police officers in the course of interrogations are . . . testimonial under even a narrow standard." *Id.* at 52. But the government argues that statements made by co-conspirators during the course and in furtherance of a conspiracy can never be testimonial, even when made in response to police questioning. *See id.* at 59 n.9; *see also Giles v. California*, — U.S. —, 128 S. Ct. 2678, 2691–92 n.1 (2008) ("[A]n incriminating statement in furtherance of [a] conspiracy would probably never be testimonial.").

We need not decide whether the remainder of the statement falls within the protections of the Confrontation Clause because any error in admitting the statement was harmless. *See United States v. Hall*, 500 F.3d 439, 443 (5th Cir. 2007) (evidence improperly admitted under *Crawford* "is subject to the doctrine of harmless error"). Improper admission under *Crawford* is harmless when "there is no reasonable probability that the improperly admitted evidence might have contributed to the conviction," *United States v. Tirado–Tirado*, 563 F.3d 117, 126 (5th Cir. 2009), for instance, when the evidence is "merely cumulative of other evidence offered without objection," *Hall*, 500 F.3d at 444.

Much of the remainder of the statement was "merely cumulative" of other evidence. In his statement, Fonzie recounted that he, Farr, and the defendant went to the victim's house and to Randolph Air Force Base on the afternoon of the murder. Both the defendant and Farr, in their statements to investigators, which were admitted at trial, discussed the events on the afternoon of the

No. 10-50239

murder.  Further, the defendant's son, Derrick Jr., testified on her behalf about the events that afternoon.

The only portion of Fonzie's statement that was not presented by any other witness was Fonzie's account of the morning after the murder wherein he stated that the defendant received a telephone call from detectives and that he accompanied the defendant to the police station.  To the extent that this small portion of Fonzie's statement was not presented by other government witnesses, any error in admission was harmless because it was not inculpatory and could not have contributed to the defendant's conviction.

## C.   Prosecutorial Comments

The defendant argues that she is entitled to a new trial because the prosecutor made improper comments during his rebuttal closing argument. The prosecutor made the following remarks:

> Now, how can I deal with Farr?  How can I explain what I have done with Farr?  It is hard.  I have to – I have to talk to the police officers who chipped away on the guilty and made sure she ended up in this courtroom.  And I have to look them in the eye and explain to them: Yes, I have to work with Farr, but by God, I will do it.
>
> I have to look at the picture, I have to look at the picture of that skull with the bullet hole in it.  That's what I had to do yesterday, and I have to go home at night too, and I have to look at myself and ask:  Have I done the right thing?

At that point, defense counsel objected, and the district court sustained the objection, directing the jury to disregard the statement.  The district court then denied the defendant's motion for a mistrial.  On appeal, the defendant argues that the prosecutor's comments were improper in two ways:  The prosecutor improperly bolstered Farr's credibility, and the prosecutor implied that he would not have brought the case if the defendant were not guilty.

No. 10-50239

We review the propriety of a prosecutor's comments during trial in two steps. *United States v. McCann*, 613 F.3d 486, 494 (5th Cir. 2010). First, we review the comments *de novo* to determine whether the comments were improper. *Id.* If we find that a comment was improper, we then determine whether the remark "affected the substantial rights of the defendant." *Id.* In the second step, we review for abuse of discretion, and we give "considerable weight" to the district court's "assessment of the prejudicial effect." *Id.* (quoting *United States v. Munoz*, 150 F.3d 401, 414–15 (5th Cir. 1998)).

A prosecutor is not permitted to express his or her personal opinion regarding the credibility of a witness. *McCann*, 613 F.3d at 495. Doing so invokes "the imprimatur of the Government, and may induce the jury to trust the Government's judgment rather than its own view of the evidence." *United States v. Ramirez–Velasquez*, 322 F.3d 868, 874 (5th Cir. 2003) (quoting *United States v. Young*, 470 U.S. 1, 18–19 (1985)). Nor may a prosecutor "imply that the government would not have brought the case unless the defendant were guilty." *United States v. Morris*, 568 F.2d 396, 401 (5th Cir. 1978). "By giving his opinion, an attorney may increase the apparent probative force of his evidence by virtue of his personal influence, his presumably superior knowledge of the facts and background of the case, and the influence of his official position." *Id.*

We examine the remarks in context to determine their propriety. *McCann*, 613 F.3d at 495. In his closing argument, defense counsel repeatedly attacked Farr's character and highlighted the fact that Farr would be receiving a lower sentence in exchange for his cooperation. Below are just a few examples:

> Jeremy Farr's testimony from the witness stand lacked so much credibility that there is absolutely no way you could be convinced beyond a reasonable doubt that Theresa had anything to do with this case at all.
>
> . . .

13

No. 10-50239

> Fonzie and Farr, these two criminals are the kind of folks we couldn't begin to fathom what is going through their feverish little minds when they decide to do something.

> . . .

> [Farr] is a cold, remorseless killer.

> . . .

> [Farr] is lying to you all and trying to get as many years and decades shaved off of his sentence as he can.

When a prosecutor's remarks are "invited" by remarks from defense counsel, the prosecutor is permitted to respond in order to "right the scale." *Id.* (quoting *Young*, 470 U.S. at 12–13); *see also United States v. Thomas*, 12 F.3d 1350, 1367–68 (5th Cir. 1994) (finding no error in prosecutor's comments that responded to defense counsel's attacks on witnesses who testified pursuant to plea agreements). The prosecutor's comments as they relate to Farr's credibility are best interpreted as an acknowledgment that many of defense counsel's remarks were correct and an attempt to explain why the government put Farr, a confessed murderer, on the stand. Furthermore, the prosecutor did not specifically tell the jury that he personally believed Farr's testimony or that Farr was a credible witness. At most, the prosecutor implied that he had overcome his own reservations about putting Farr on the stand.

The prosecutor's comments related to the defendant's guilt are more troublesome. By his comments, the prosecutor implied that he and the police officers he worked with had already made up their minds that the defendant was guilty. The prosecutor also implied he personally believed he had done the right thing in bringing the defendant to trial.

Even assuming the prosecutor's comments rise to the level of impropriety, they did not affect the defendant's substantial rights. To determine whether the defendant's substantial rights were affected, we are guided by "(1) the magnitude of the statement's prejudice, (2) the effect of any cautionary

14

instructions given, and (3) the strength of the evidence of the defendant's guilt." *McCann*, 613 F.3d at 496 (quoting *United States v. Gallardo–Trapero*, 185 F.3d 307, 320 (5th Cir. 1999)). "The determinative question is whether the prosecutor's remark casts serious doubt on the correctness of the jury's verdict." *United States v. Insaulgarat*, 378 F.3d 456, 461 (5th Cir. 2004) (quoting *United States v. Iredia*, 866 F.2d 114, 117 (5th Cir. 1989)).

The prosecutor's comments cast no doubt on the verdict. The comments were short and embedded in the prosecutor's response to defense counsel's attacks on Farr's credibility. Further, the district court instructed the jury to disregard the comments, and prior to closing argument the district court instructed the jury that they were "the sole judges of the credibility or believability of each witness" and that "any statements, objections, or arguments made by the lawyers are not evidence." Finally, the evidence of the defendant's guilt is substantial. Farr testified that the defendant asked him to murder the victim, showed him how to enter and leave the victim's house, and paid him in cash and clothing; and the government presented evidence to corroborate Farr's testimony, including phone and bank records and the defendant's own statements.

Given the low level of possible prejudice and the "considerable weight" we are required to give to the district court's assessment that the comments did not require a mistrial, the prosecutor's comments did not have the necessary prejudicial effect to warrant reversal of the defendant's conviction.

### D. Jury Instructions

The defendant argues that the district court improperly instructed the jury regarding the elements of conspiracy to commit murder-for-hire such that the jury was permitted to find the defendant guilty without finding beyond a reasonable doubt that she acted with intent that a murder be committed.

The district court instructed the jury as follows:

No. 10-50239

In order for the defendant to be found guilty of conspiring to commit murder-for-hire in violation of Section 1958(a), the government must prove each of the following elements beyond a reasonable doubt:

First, that on or about the dates charged in the indictment, the defendant and at least one other person made an agreement to commit the crime of interstate murder-for-hire as charged in the indictment;

Second, that the defendant knew the unlawful purpose of the agreement and joined in it willfully, that is, with the intent to further that unlawful purpose;

Third, that one of the conspirators during the existence of the conspiracy knowingly traveled or caused another to travel from Arkansas to Texas for the purpose of carrying out or carrying forward the agreement; and

Fourth, that the death of Derrick Tolliver resulted.

Following some general instructions regarding conspiracies, the district court further instructed the jury regarding the first element of conspiracy to commit murder-for-hire:

To assist you in determining whether there was an agreement or understanding to commit murder-for-hire as charged in the indictment, you are advised that the elements of the offense of murder-for-hire are:

One, traveling or causing another to travel in interstate commerce;

Two, with the intent that a murder be committed in violation of the laws of the State of Texas; and

Three, that a thing of pecuniary value, such as a sum of money, was received or promised or agreed to be paid as consideration for the murder.

We review a properly objected-to jury instruction for abuse of discretion. *United States v. Freeman*, 434 F.3d 369, 377 (5th Cir. 2005). "District courts enjoy substantial latitude in formulating a jury charge." *United States v. Webster*, 162 F.3d 308, 321 (5th Cir. 1998). "We consider whether the

instruction, taken as a whole, 'is a correct statement of the law and whether it clearly instructs the jurors as to the principles of law applicable to the factual issues confronting them.'" *Freeman*, 434 F.3d at 377 (quoting *United States v. Daniels*, 281 F.3d 168, 183 (5th Cir. 2002)).

The defendant was charged with conspiracy to commit murder-for-hire under 18 U.S.C. § 1958(a). "The elements of conspiracy to commit federal murder-for-hire under § 1958 are '(1) an agreement by two or more persons to achieve the unlawful purpose of [interstate] murder-for-hire; (2) the defendant's knowing and voluntary participation in the agreement; and (3) an overt act committed by any one of the conspirators in furtherance of the conspiratorial object.'" *United States v. Blackthorne*, 378 F.3d 449, 453 (5th Cir. 2004) (quoting *United States v. Hernandez*, 141 F.3d 1042, 1053 (11th Cir. 1998)) (alteration in original). The government must also prove beyond a reasonable doubt that the defendant intended all of the elements of the underlying murder-for-hire offense. *United States v. Barnett*, 197 F.3d 138, 146 (5th Cir. 1999).

The district court's instructions stated the law correctly. The district court properly explained all of the elements of both conspiracy to commit interstate murder-for-hire and the underlying interstate murder-for-hire offense. The court instructed the jury that it had to find the elements of conspiracy beyond a reasonable doubt, after which it instructed the jury regarding the elements of the underlying offense. The jury likely did not, and indeed probably could not, find beyond a reasonable doubt that the defendant intended to enter into an agreement to commit interstate murder-for-hire without also finding beyond a reasonable doubt that she intended all of the elements of the underlying offense. We therefore find no error in the instruction.

**E.      Sufficiency of the Evidence**

Finally, the defendant challenges the sufficiency of the evidence supporting her conviction. In reviewing a sufficiency of the evidence claim, we

consider whether "a rational trier of fact could have found that the evidence established the essential elements of the offense beyond a reasonable doubt." *United States v. Lopez*, 74 F.3d 575, 577 (5th Cir. 1996). Our review is "highly deferential to the verdict," and we consider the evidence "in the light most favorable to the government with all reasonable inferences and credibility choices made in support of a conviction." *United States v. Najera Jimenez*, 593 F.3d 391, 397 (5th Cir. 2010) (citation omitted).

The defendant contends that the government presented insufficient evidence to prove beyond a reasonable doubt that she was aware that Farr was promised payment in return for murdering the victim because the government did not prove that she was present for any of the conversations during which Fonzie agreed to pay Farr. We disagree.

To convict the defendant of murder-for-hire, the government must have presented evidence from which the jury could conclude that the defendant knew that a payment or promise of payment was part of the agreement. *See United States v. Ritter*, 989 F.2d 318, 321 (9th Cir. 1993). Here, the government presented considerable evidence from which the jury could have concluded that the defendant knew Fonzie had promised to pay Farr. Farr testified that Fonzie told him the defendant was present when Fonzie placed the initial call to Farr. Farr also testified that he personally had a conversation with the defendant during which she confirmed that she wanted Farr to murder the victim. Farr further testified that he asked the defendant and Fonzie about the money after the murder and *they* told him that "the big money won't come in for awhile." In addition, the government presented evidence that the defendant purchased several items for Farr before he left San Antonio and that she gave Farr a large amount of cash while she was in Arkansas a year later.

In support of her contention, the defendant argues that Farr was completely unreliable and unbelievable when he testified that she was involved

in the scheme and that she knew about the payment. But "[t]he jury is the final arbiter of the credibility of a witness." *United States v. Razo–Leora*, 961 F.2d 1140, 1145 (5th Cir. 1992). The jury could have easily credited Farr's testimony that the defendant was involved and disregarded her assertions that Farr was unreliable and not believable.

The defendant does not contest the government's proof regarding the other elements of murder-for-hire, and the government presented sufficient evidence of the defendant's guilt with respect to the remaining elements. Therefore, we conclude that the government presented sufficient evidence to sustain the conviction.

## III.   CONCLUSION

For the foregoing reasons, we AFFIRM the defendant's conviction.