**REVISED MAY 22, 2014**

# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**FILED**

May 21, 2014

Lyle W. Cayce
Clerk

No. 12-30926

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

GEORGE L. GRACE, SR.,

Defendant-Appellant.

Appeal from the United States District Court
for the Middle District of Louisiana
USDC No. 3:10-CR-143

Before DAVIS, BARKSDALE, and ELROD, Circuit Judges.

PER CURIAM:[*]

Defendant-Appellant George Grace, Sr. ("Grace"), the former mayor of a small town in Louisiana, appeals his conviction for corruption-related offenses, as well as his sentence. We affirm his conviction, vacate the sentence imposed by the district court, and remand for further proceedings consistent with this opinion.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-30926

I.

Grace is the former mayor of the City of St. Gabriel, LA. The Federal Bureau of Investigation ("FBI") began investigating reports of corruption involving Grace in 2006 after it received a tip from local law enforcement in St. Gabriel. From late 2006 through the summer of 2010, the FBI conducted a series of four undercover investigations into Grace's conduct. Those investigations included: 1) relief efforts in St. Gabriel after Hurricane Katrina ("the Hurricane Katrina Scheme"); 2) a vendor doing business with the City of St. Gabriel ("the City Vendor Scheme"); 3) the sale and development of real estate in St. Gabriel ("the Real Estate Scheme"); and 4) a fictional product for cleaning garbage cans known as the Cifer 5000 (the "Cifer Scheme").

Following the FBI investigation, a grand jury returned a 13-Count indictment against Grace. After trial, a jury convicted Grace on seven of the thirteen Counts. Grace now appeals his conviction on the following five Counts: a) Count 1, charging a violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.; b) Count 8, charging federal program bribery in violation of 18 U.S.C. § 666; c) Count 9, charging honest services and property mail fraud in violation of 18 U.S.C. §§ 1341 and 1346; d) Count 11, charging honest services and property wire fraud in violation of 18 U.S.C. §§ 1343 and 1346; and e) Count 13, charging use of an interstate facility (telephone) in aid of racketeering in violation of 18 U.S.C. § 1952. Finally, Grace also appeals the 22-year sentence imposed by the district court.

The Counts which Grace appeals involve two of the four schemes mentioned above: the Real Estate Scheme and the Cifer Scheme, which we will discuss below, including the facts relevant to those schemes.

No. 12-30926

II.

We address Grace's convictions in four groups: a) Count 9 for honest services fraud and property mail fraud in violation of 18 U.S.C. §§ 1341 and 1346, and Count 11 for mail and wire fraud in violation of 18 U.S.C. §§ 1343 and 1346; b) Count 13 for use of a telephone to violate the Louisiana state public bribery statute in violation of 18 U.S.C. § 1952; c) Count 8 for federal program bribery in violation of 18 U.S.C. § 666; and d) Count 1, the RICO violation.

a. Grace's convictions in Counts 9 and 11

The charges in Counts 9 and 11 concern two official letters of support Grace provided to undercover FBI Special Agent Darin McAllister ("McAllister") and cooperating FBI witness William Myles ("Myles") during a sting operation. Agent McAllister and Myles posed as representatives of Cifer 5000 ("Cifer"), a fictitious company which provided garbage-can-cleaning services. Agent McAllister operated under the alias of "DJ," and held himself out as the financial partner in the Cifer business. In exchange for several thousand dollars, Grace provided letters supporting Cifer to Agent McAllister and Myles. In these letters, Grace, in his official position as Mayor of St. Gabriel, strongly endorsed Cifer and falsely represented that he was in the process of bringing the Cifer service to his City. The letter Grace gave to Agent McAllister was intended to persuade potential private investors to invest money in Cifer (the "Private Investor Letter"). The letter Grace gave to Myles was intended to help Cifer secure a grant from the Environmental Protection Agency (the "EPA Letter").

Grace argues that the convictions in Counts 9 and 11 should be vacated for three reasons. First, his conviction in Count 9 should be vacated because he was not permitted to examine Agent McAllister at trial, which violated his

right to due process. Second, the convictions on both Counts 9 and 11 should be set aside because there was insufficient evidence to show that Grace had the specific intent to defraud potential investors and the EPA of money. And third, the convictions should be vacated because the district court improperly instructed the jury that it is not a defense that the public official involved would have performed the official action regardless of the bribe.

   i.     *Due Process*

Grace was convicted in Count 9 for honest services and mail fraud, in violation of 18 U.S.C. §§ 1341 and 1346, for causing the mailing of the Private Investor Letter to Agent McAllister, who was posing as "DJ." In the Letter, Grace vouched for the Cifer service as Mayor of St. Gabriel and falsely claimed he had presented the idea of using the service to the city council and they were making progress toward a contract with Cifer. In exchange for writing the Letter, Agent McAllister wired Grace $8,000 to pay for Grace and his associate to travel to Libya and Uganda. Agent McAllister's recorded statements to Grace during the sting operation were introduced at trial, but he did not testify. Instead, when called as a witness by Grace, Agent McAllister properly asserted his Fifth Amendment privilege against self-incrimination which arose out of an unrelated investigation for fraud-related offenses. Grace contends his inability to examine Agent McAllister violated his right to due process under the Fifth Amendment, and therefore his conviction in Count 9 should be vacated.

The parties dispute the standard of review because they disagree whether Grace sufficiently objected at trial so as to preserve the error. We conclude, however, that this argument is without merit regardless of which standard of review is applied. At trial, Grace made the only arguable objection available to him under the Sixth Amendment's Confrontation Clause. That

No. 12-30926

objection is meritless. Agent McAllister's statements were not admitted for their truth. The government never contended they were true. To the contrary, they were obviously untrue as they were made in the context of a sting operation. The statements were admitted to show that the offer of a payment was made to Grace, who then accepted the offer. What Agent McAllister said (as opposed to the truth of the statement) and Grace's response are direct evidence of the crime. "[T]he Confrontation Clause does not bar the use of testimonial statements for purposes other than establishing the truth of the matter asserted. Instead, to constitute a Confrontation Clause violation, the statement must be used as hearsay—in other words, it must be offered for the truth of the matter asserted."[1]

Nor does the admission of Agent McAllister's recorded statements violate Grace's right to due process. A violation of a defendant's rights under the Due Process Clause of the Fifth Amendment "requires some showing that the evidence lost would be both material and favorable to the defense."[2]  Grace fails to show that McAllister's testimony would have been either favorable to his defense or material. He speculates that, on cross-examination, he would have been able to establish that Grace was not attentive during his conversations with McAllister and did not hear McAllister's statements. But Grace testified at trial that he heard McAllister's statements which linked payments to the writing of the Private Investor Letter. Also, evidence of this scheme was

---

[1] *United States v. Polidore*, 690 F.3d 705, 719 n.15 (5th Cir. 2012) (citations and internal quotation marks omitted); *see also United States v. Tolliver*, 400 F. App'x 823, 830 (5th Cir. 2010) ("Statements not offered for their truth, even if testimonial in nature, are not subject to [the protections of the Confrontation Clause].") (citing *United States v. Holmes*, 406 F.3d 337, 349 (5th Cir. 2005)).

[2] *United States v. Valenzuela-Bernal*, 458 U.S. 858, 873 (1982); *see also United States v. Villanueva*, 408 F.3d 193 (5th Cir. 2005).

5

corroborated by the Letters provided to both Agent McAllister and Myles, Grace's confession during an FBI interview, and, in some instances, Myles's testimony. Both the Confrontation Clause and due process arguments are meritless. Thus, the district court did not err when it admitted the recorded conversations which included Agent McAllister's statements.

### ii.     Insufficient Evidence

Grace next contends that his convictions in Counts 9 and 11 should be set aside because the evidence was insufficient to prove he had specific intent to defraud the Cifer investors. Count 9 charged Grace with honest services and mail fraud for providing the Private Investor Letter, discussed above. To obtain a conviction for mail fraud under § 1341, the government must prove "(1) a scheme to defraud; (2) the use of the mails to execute the scheme; and (3) the specific intent to defraud."[3]    Count 11 charged Grace with use of the wires in connection with a scheme to defraud the EPA of money and property, in violation of 18 U.S.C. §§ 1343 and 1346. The elements of wire fraud under § 1343 are: "(1) a scheme to defraud and (2) the use of, or causing the use of, wire communications in furtherance of the scheme."[4] In order to convict for the federal crime of honest services fraud under § 1346, the government "'must prove that the conduct of a state official breached a duty respecting the provision of services owed to that official's employer under state law.'"[5] In Count 11, the fraud was based on the letter that Grace signed and sent to the EPA praising Cifer to assist Cifer in obtaining a grant from the EPA to finance the Cifer services in St. Gabriel and other cities. Like the Private Investor

---

[3] *United States v. Bieganowski*, 313 F.3d 264, 275 (5th Cir. 2002) (citation omitted).

[4] *United States v. Stalnaker*, 571 F.3d 428, 436 (5th Cir. 2009).

[5] *United States v. Whitfield*, 590 F.3d 325, 348 (5th Cir. 2009) (quoting *United States v. Brumley*, 116 F.3d 728, 734 (5th Cir. 1997) (en banc)).

No. 12-30926

Letter, the EPA Letter contained false representations by Grace that the City was progressing toward implementing the Cifer system. Myles wired Grace $1,000 into his personal account in exchange for providing the Letter.

Again, the parties dispute the standard of review. We find that, regardless of which standard is applied, Grace's sufficiency argument is meritless.

Grace argues that the evidence presented by the government was sufficient to prove, at most, that he had knowledge the fraud would occur, and not that he had the specific intent to defraud.

Mail and wire fraud both require a specific intent to defraud.[6] The district court properly instructed the jury that "[a]n 'intent to defraud' means an intent to deceive or cheat someone,"[7] and that the jury "may also consider the natural and probable results of any acts the defendant knowingly did or did not do, and whether it is reasonable to conclude that the defendant intended those results." The jury was entitled to find from the evidence that Grace knew the Letters he wrote contained false representations, and that Grace's objective was to persuade investors and the EPA to give money based in part on those lies. Grace admitted as much in an FBI interview, and at trial. For example, when asked by the Assistant U.S. Attorney, "And you had no problem with the fact thatthey [Myles and Agent McAllister] were going to use a false letter to raise money?" Grace responded, "That would be on them . . . as far as I was concerned."[8] Here, the evidence of Grace's knowledge of the

---

[6] *See United States v. Bernegger*, 661 F.3d 232, 240 (5th Cir. 2011) (mail fraud); *United States v. Radley*, 632 F.3d 177, 185 (5th Cir. 2011) (wire fraud).

[7] FIFTH CIRCUIT PATTERN JURY INSTRUCTIONS (Criminal Cases) § 2.59 (2001).

[8] In addition, the following testimony from Grace on cross examination reveals his knowledge of the falsehoods:

No. 12-30926

scheme and the role his Letters played in furthering the scheme was sufficient for the jury to find that Grace acted with the specific intent required for Counts 9 and 11.

### iii.    *Improper Jury Instruction*

Third, Grace argues that this court should vacate his convictions in Counts 9 and 11 because the district court issued an improper jury instruction as to honest services fraud. Grace claims the district court erred when it issued the following jury instruction: "It is not a defense [to honest services fraud] to claim that a public official would have lawfully performed the official action in question even without having accepted a thing of value."

Honest services fraud in the form of bribery requires proof of a quid pro quo and, therefore, the Government must prove "a specific intent to give or receive something of value *in exchange* for an official act."[9]  According to Grace, the jury instruction was improper because if an "official would have performed

---

**Q:** So you're – if I understand it correctly, you were okay with letting this false, fraudulent letter out to investors because you didn't figure that they would ultimately invest anything. So you were fine with that; is that what you're saying?

**A:** I didn't think there were any businessmen anywhere who would not look at the facts and the figures before they would invest that kind of money in a venture like that. If anybody would be venture capitalists, they would want to know the populations, the facts and the figures from those six towns that he was talking about, and that would not give anybody cause to invest $2 to 3 million, Mr. Amundson.

**Q:** So you didn't mind lying to them?

**A:** He wanted the letter; I gave it.

**Q**: That's a "yes" or a "no," sir.

**A:** Yes.

[9] *United States v. Sun-Diamond Growers of Cal.*, 526 U.S. 398, 404–05 (1999) (emphasis in original).

No. 12-30926

the specified act anyway, the official would not have taken the bribe with the intent to be influenced, and there would have been no corrupt exchange."

Grace failed to raise this objection at the trial court. We therefore review this argument for plain error, and find that the district court did not err in giving this instruction.

As the Government correctly points out, *Skilling v. United States* holds that honest services fraud under 18 U.S.C. § 1346 encompasses only bribery and kickback schemes.[10] To define "bribery" and "kickbacks," the Court in *Skilling* directed courts to look to federal statutes defining similar crimes, such as 18 U.S.C. §§ 201 (defining bribery of federal officials) and 666 (defining bribery concerning federally funded entities).[11] We have interpreted § 666 to mean that a public official can be guilty of bribery "even if he has no intention of actually fulfilling his end of the bargain."[12] The decisive factor is that the public official has "corruptly entered into a quid pro quo, knowing that the purpose behind the payment that he has received, or agreed to receive, is to induce or influence him in an official act."[13] The jury instruction was consistent with *Skilling*. It is enough that Grace took the money with the knowledge that it was intended to influence him, even if he would have written the Letters without the payment. Accordingly, the district court committed no error, plain or otherwise, in giving this instruction, regardless of the standard of review.

b.   Grace's conviction in Count 13

---

[10] 130 S. Ct. 2896, 2928–31 (2010).

[11] *Id.* at 2933–34.

[12] *United States v. Valle*, 538 F.3d 341, 347 (5th Cir. 2008).

[13] *Id.*

No. 12-30926

Grace's conviction in Count 13 involves his use of his official influence as Mayor of St. Gabriel to promote the Cifer system. Grace helped organize meetings to introduce a group of fellow mayors from nearby cities to Myles and Agent McAllister. These meetings were organized to provide Myles and Agent McAllister the opportunity to discuss the Cifer system with the other mayors, and assist Myles and Agent McAllister in selling the Cifer service to their cities. During the meetings, Myles expressed his desire to obtain contracts with each of the cities, and made it clear he was willing to pay the mayors for their support. After at least two of the meetings, Grace accepted a $2,000 payment from Myles and Agent McAllister for his work in promoting the Cifer service with the other mayors, and the use of his official influence to persuade them.

Grace argues his conviction in Count 13 should be vacated for two reasons: first, because there was insufficient evidence presented at trial that his conduct constituted an "official action" as Mayor of St. Gabriel; and second, because the district court's jury instruction on "official action" was overbroad.

*i.     Sufficiency of the evidence*

Grace was convicted in Count 13 for use of a telephone in aid of racketeering in violation of 18 U.S.C. § 1952, which makes it a federal crime to use an interstate facility with the intent to carry on any "unlawful activity," including bribery in violation of state law.[14] Specifically, the jury found that Grace had used a telephone with the intent of committing the offense of bribery under Louisiana law when he accepted $2,000 from Myles in exchange for

---

[14] *See* 18 U.S.C. § 1952 (b) (defining "unlawful activity" as "extortion, bribery, or arson in violation of the laws of the State in which committed or of the United States, . . . ."). Section 1952 provides, in relevant part, "Whoever . . . uses the mail or any facility in interstate or foreign commerce, with intent to . . . promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of any unlawful activity . . . shall be fined under this title, imprisoned not more than 5 years, or both . . . ." 18 U.S.C. § 1952 (a).

10

promoting the Cifer service with other mayors. The Louisiana public bribery statute, Louisiana Revised Statutes Section 14:118(A), prohibits the receipt of a bribe "with the intent to influence [a person's] conduct in relation to [one's] position, employment or duty."[15] Grace argues that his promotion of the Cifer service with other mayors outside of St. Gabriel, and use of his influence with those mayors, did not fall within the scope of the official conduct described in the state statute.

Grace did not raise this objection at trial, so we review this claim for plain error.

We look to Louisiana law for the elements of its crime of bribery. The Louisiana Supreme Court has stated that the "gravamen" of the offense denounced in § 14:118 "is the giving or offering to give (as well as the acceptance or offer to accept) anything of present or prospective value to the specifically delineated public . . . official with the intent of influencing his conduct 'in relation to his position, employment, or duty' as such."[16]

Unable to cite a Louisiana case to support his position, Grace contends that the Louisiana Supreme Court has "analogized" the definition of a public official's "position, employment, or duty" under § 14:118 to an "official act" under the federal public bribery statute, 18 U.S.C. § 201. According to Grace, his exercise of influence over other mayors does not constitute an "official act" under federal law. However, based on this record the jury was entitled to find that Grace's promotion of the Cifer service was within the range of official

---

[15] LA. REV. STAT. ANN. § 14:118(A).

[16] *State v. Smith*, 212 So.2d 410, 414 (La. 1968); *United States v. L'Hoste*, 609 F.2d 796, 807 (5th Cir. 1980) ("The inquiry under the Louisiana statute . . . is whether the gift is made, not as a Quid pro quo for specific action, but with the intent to influence the conduct of the public servant in relation to his position, employment, or duty.").

No. 12-30926

action under federal law. The definition of "official act" is quite broad, encompassing "any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit."[17] "Official acts that violate an official's official duty are not limited to those proscribed by statutes and written rules and regulations, but may also be found in 'established usage,' because 'duties not completely defined by written rules are established by settled practice, and action taken in the course of their performance must be regarded as within the provisions of the above-mentioned statutes against bribery.'"[18]

Grace contends his official mayoral duties were limited to those he owed to the City of St. Gabriel, and that payments for promoting the Cifer service outside of St. Gabriel fall outside the range of those duties. However, both the record in this case and prior decisions of this court support a different conclusion.[19] Grace's executive assistant testified that Grace's regular contacts with other mayors were part of his official duties. Other area mayors also testified that consulting with fellow mayors about city vendors was part of each mayor's official duties.

Thus, we conclude that the jury was entitled to find Grace's exercise of influence over mayors of other cities in exchange for payments from Myles and

---

[17] 18 U.S.C. § 201(a)(3).

[18] *United States v. Parker*, 133 F.3d 322, 326 (5th Cir. 1998) (quoting *United States v. Birdsall*, 233 U.S. 223, 231 (1914)).

[19] *See United States v. Bustamante*, 45 F.3d 933, 938 (5th Cir. 1995) (United States Congressman performed an official act when he used his influence in an effort to persuade the U.S. Air Force to award a contract to a particular private contractor); *United States v. Heard*, 709 F.3d 413, 422 (5th Cir. 2013) (an employee with Federal Protective Services performed an official act when he provided the General Services Administration with a favorable reference for a particular contractor).

12

No. 12-30926

Agent McAllister constituted an official action, and his conviction in Count 13 should not be vacated based on this argument.

### *ii.     Improper jury instruction*

Grace next argues that the district court's jury instruction on "official action" in Count 13 was improper because it was "overbroad."[20]

We review this ruling for abuse of discretion.[21] The first part of the jury instruction at issue stated:

> The term "official action" includes every act that is within the range of official duty of a public official and includes any decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may, by law, be brought before any public official in such public official's capacity or in such official's official place of trust or profit.

Grace takes issue with this part of the instruction because he claims it has broadened the offense to include conduct that does not fall within the statutory definition of official action under 18 U.S.C. § 201.[22] The only language added by the district court not included in § 201 is near the beginning of its jury instruction, where it said that an official action "includes every

---

[20] The district court defined "official action" in its instruction in Counts 9 and 11 charging honest services fraud, but did not do so in its instruction in Count 13. Grace objected to the definition of "official action" for Counts 9 and 11 during the charge conference. However, an "official action" is also required for conviction in Count 13. Because Grace objected to the district court's definition of this term when he had the opportunity to do so in Counts 9 and 11, his claim of the same error to the courts' definition of the term in Count 13 was also preserved.

[21] *United States v. Richardson*, 676 F.3d 491, 506 (5th Cir. 2012).

[22] Section 201 defines "official act" as:

> [A]ny decision or action on any question, matter, cause, suit, proceeding or controversy, which may at any time be pending, or which may by law be brought before any public official, in such official's official capacity, or in such official's place of trust or profit.

18 U.S.C. § 201(a)(3).

No. 12-30926

action that is within the range of official duty of a public official." This language mirrors the Supreme Court's opinion in *United States v. Birdsall*, which stated that "[e]very action that is within the range of official duty comes within" the purview of official action.[23] "In numerous instances, duties not completely defined by written rules are clearly established by settled practice, and action taken in the course of their performance must be regarded as within [the meaning of "official action"]."[24] The language used by the district court in its instruction is consistent with *Birdsall*, and it did not err when it issued this part of the instruction.[25]

Grace then shifts his focus to the end of this jury instruction, which states, "It is not necessary that the public official have the authority to make a binding decision on the matter in question. Rather, official acts include the exercise of official influence through advice or recommendation to others." Grace's complaint with this section of the instruction is that "influence" is too vague, and includes both the exercise of influence by virtue of official power as well as the exercise of influence by virtue of personal respect. This is a

---

[23] 233 U.S. at 230. *See also United States v. Heard*, 709 F.3d 413, 421 (5th Cir. 2013) ("We have recognized that the definition [of 'official action'] is intended to 'include any decision or action taken by a public official in his capacity as such,' and official acts are 'not limited to those within the official's specific authority.'" (quoting *United States v. Parker*, 133 F.3d 322, 326 (5th Cir. 1998))).

[24] *Id.* at 231.

[25] We are aware of the D.C. Circuit's position that the broad language in "*Birdsall* did not . . . stand for the proposition that every action within the range of official duties *automatically* satisfies § 201's definition." *Valdes v. United States*, 475 F.3d 1319, 1323 (D.C. Cir. 2007). Assuming *arguendo* that the D.C. Circuit is correct, we nevertheless conclude that the district court here did not abuse its discretion in light of the fact that it employed § 201's specific language regarding the type of action that falls within the term "official action"—i.e., "any decision or action on any *question, matter, cause, suit, proceeding or controversy*, which may at any time be pending, or which may by law be brought before any public official, such official's official capacity." § 201(a)(3) (emphasis added). Moreover, as we explained above, Grace's actions fit comfortably within the statutory definition of "official action."

14

No. 12-30926

meritless argument. The instruction itself describes only "official influence"; there is no room for an interpretation which would include personal influence.

c.  Grace's conviction in Count 8

Grace argues this conviction should be vacated due to the erroneous admission of Myles's lay opinion testimony.[26] Grace was convicted in Count 8 for bribery involving programs which receive federal funds, in violation of 18 U.S.C. § 666. This conviction involves the Real Estate Scheme,[27] in which he and Myles participated in ongoing negotiations regarding the sale and development of two properties in St. Gabriel: a 17-lot property which Grace owned personally (the "Personal Property"), and a larger, 90-lot property which was owned by the City (the "City Property"). Myles first approached with overtures about purchasing the City Property. During the course of the negotiations, Grace attempted to convince Myles to purchase the Personal Property. As an incentive to do so, Grace would give Myles the opportunity to purchase and develop the City Property without having to endure the public bidding process. Also during the negotiations, Grace offered to funnel money from various federal government programs to Myles in exchange for purchasing the Personal Property. Grace provided Myles with backdated letters which falsely represented the zoning of the properties to help Myles secure a $900,000 loan from a bank. Grace also accepted various cash payments from Myles throughout this time, and offered to use his influence as

---

[26] Grace also takes issue with the testimony of FBI Special Agent Tonja Sablatura. Grace objected to that part of Sablatura's testimony which was relevant to Count 8, and the district court sustained the objection. Therefore, by the time the case went to the jury, the district court had directed the jury to disregard the agent's testimony as it related to this count, so any error was harmless because juries are presumed to follow instructions. *See, e.g., Wllogix v. Accenture, L.L.P.*, 716 F.3d 867, 876 (5th Cir. 2013).

[27] This scheme pre-dated the Cifer scheme which forms the factual basis for Counts 9, 11, and 13.

15

No. 12-30926

Mayor to make Myles a minority owner in a proposed racetrack and casino truck stop. Neither project was realized.

Grace argues that Myles's testimony was improper because it was unhelpful to the jury since Grace's statements were easily understood without the aid of additional interpretation.

Where a party properly objects before the district court, this court reviews the admissibility of lay opinion testimony for abuse of discretion.[28]

To be admissible under Rule 701 of the Federal Rules of Evidence, a lay opinion must be rationally based on the perception of the witness and helpful to a clear understanding of the witness' testimony or the determination of a fact at issue.[29] "[T]he distinction between lay and expert witness testimony is that lay testimony 'results from a process of reasoning familiar in everyday life,' while expert testimony 'results from a process of reasoning which can be mastered only by specialists in the field.'"[30] "A lay opinion must be based on personal perception, must be one that a normal person would form from those perceptions, and must be helpful to the jury."[31]

The district court explained why it allowed Myles to testify about his understanding of Grace's statements as follows:

> In this case, the jury's understanding of Grace's recorded statements to Myles would be greatly assisted by Myles' testimony concerning such statements. Grace appears to the Court to be a savvy and experienced politician, based on evidence presented so far, with a rather savvy and experienced knack for engaging in off-the-record conversations and the use of "sign language."

---

[28] *United States v. El-Mezain,* 664 F.3d 467, 511 (5th Cir. 2011).

[29] Fed. R. Evid. 701.

[30] *United States v. Ebron*, 683 F.3d 105, 136–37 (5th Cir. 2012) (quoting *United States v. Yanez Sosa*, 513 F.3d 194, 200 (5th Cir. 2008)).

[31] *Id.* (citing *United States v. Riddle*, 103 F.3d 423, 428 (5th Cir. 1997)).

No. 12-30926

While discussing the so-called corrupt transactions, based on the evidence presented, Grace appears to be keenly aware of the possibility that law enforcement may, in fact, be monitoring his conversations. As a result, these purportedly clear statements by the defendant, Grace, are anything but clear when put into proper context.

Grace appears to have practiced and refined the art of solicitation where the words out of his mouth are not always intended to match their intended and purportedly clear meaning.

The record supports the district court's reasons for admitting Myles's lay opinion testimony. Because Grace's statements "did not always speak for themselves," Myles's testimony on the true meaning of these statements was helpful to the jury's understanding of this evidence. [32] Moreover, because Myles was a participant in the conversations, and he testified to his understanding of the communications, his testimony is "rationally based on his perceptions." [33] The district court therefore did not abuse its discretion in admitting Myles's testimony.

---

[32] *See United States v. Flores*, 63 F.3d 1342, 1359 (5th Cir. 1995). The following is an example of Myles's testimony relating to his recorded conversations with Grace:

> **Q [to Myles]:** All right. On this clip here, when Mayor Grace says, "We can talk. We ain't got that much tricky business to talk about," then goes on to say, "But I'm just letting you know why I say what I say, you know, what do you understand him to be telling you here?"

> **A [From Myles]:** Well the only tricky business we got is that he - - he told me that, basically, if I wanted to play, if I gave him $170,000, then I got the right to do the other thing [the City Property]. That's the only business Mayor Grace and I have at this time that's tricky business.

> But when he says - - and you have to look at the totality of it. He's just talked about wire. He's just talked about "I don't talk in the car." Here you see him saying, "I'm just letting you know why I say what I say."

> Mayor Grace is a strong leader, and so you'll see that he thinks that I'm naïve, he thinks I'm green, and so he's letting me know why he say certain things. Because you'll see later on he may say one - - he may preach one thing, but he don't practice it. So he's kind of letting me know how he operates.

[33] *United States v. Parsee*, 178 F.3d 374, 379–80 (5th Cir. 1999) (citing *Flores*, 63 F.3d at

17

No. 12-30926

d.  Grace's conviction in Count 1

Finally, Grace contends that reversal of his conviction in Counts 8, 9, 11, and 13 requires that his RICO conviction in Count 1 be reversed because the jury would not have found him to have committed multiple Racketeering Acts. This argument hinges upon our reversal of Grace's convictions in the other Counts. Because we affirm those convictions, this argument fails.

### III.

For his last issue, Grace challenges the sentence imposed by the district court, claiming it erred in calculating the amount of loss for the EPA and Private Investor Letters at $3 million each. In support of this argument, Grace points to an almost identical case from this court, *United States v. Nelson*.[34]

*Nelson* involved a related FBI undercover operation to the operation in Grace's case. This court vacated the defendant's sentence because of an error in the intended loss calculation for the drafting of two letters of support, one to the EPA and one to private investors.[35] These letters are almost identical to the EPA and Private Investor Letters in the instant case. Based on Nelson's belief that the letter would "assist the Cifer folks" in obtaining grants, the district court in *Nelson* valued the intended loss of the EPA letter at $4 million and the private investor letter at $2 million. On appeal, this court determined that those calculations were incorrect. As to the EPA letter, the court found there was "insufficient evidence to adequately differentiate between legitimate funding Cifer could have received from the EPA, and any benefits that Nelson intended to stem from this false statement in his letter that he had met with

---

1342).

[34]  732 F.3d 504 (5th Cir. 2013).

[35]  *Id.* at 521–24.

No. 12-30926

other mayors regarding Cifer and similar projects."[36] The court in *Nelson* concluded that this was a case "in which the amount of loss cannot reasonably be determined, and it may therefore be more appropriate to use 'the gain that resulted from the offense as an alternative measure of loss.'"[37] The court posited that the "most appropriate valuation of the EPA letter may be the amount Nelson received for writing it,"[38] which was $10,000. The court also vacated the district court's intended loss calculation of $2 million for the private investor letter based on similar reasons.[39]

The district court's intended loss calculation in Grace's case contains similar flaws. For the EPA Letter, the intended loss calculation of $3 million is based on a statement by an FBI Agent to Grace that he was "gonna get . . . 3 to 4 million dollars per city" in grants as a result of the Letter. Just as in *Nelson*, the Letter was not a grant application and did not specify a requested grant amount. Grace was paid $1,000 to draft the EPA Letter. For the Private Investor Letter, the intended loss calculation of $3 million was based on an agent's statement to Grace that the Letter would be used to raise $2–3 million in capital. Again, the Letter did not specify a requested amount. Grace was paid $8,000 in exchange for providing the Letter.

Thus, we vacate the district court's sentence and remand to the district court for a recalculation of the appropriate loss amount.

---

[36] *Id.* at 522.

[37] *Id.* (citing U.S. SENTENCING GUIDELINES § 2B1.1, cmt. 3(B)).

[38] *Id.* at 522–23.

[39] *Id.* at 524 ("Because we have concluded that a loss recalculation for the EPA letter is appropriate on remand, and because the district court's reasoning with regard to the private investor letter relied in part on Nelson's general expectation to generate 'a large sum of money,' we deem that closer scrutiny is advisable regarding the valuation of the private investor letter.").

No. 12-30926

IV.

For the foregoing reasons, we AFFIRM the conviction, but VACATE the sentence and REMAND this case for resentencing in light of this opinion.